

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Confederación de Organizadores de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>Servidores Públicos Unidos de Puerto Rico<br><br>Recurrida | Certiorari<br><br>2011 TSPR 47<br><br>181 DPR \_\_\_\_ |

Número del Caso: CC - 2006 - 171

Fecha: 28 de marzo de 2011

Tribunal de Apelaciones:

Región Judicial de San Juan

Jueza Ponente:

Hon. Dolores Rodríguez de Oronoz

Abogado de la Parte Peticionaria:

Lcdo. Carlos Ortiz Abrams

Abogadas de la Parte Recurrida:

Lcda. Isabel Barradas Bonilla
Lcda. Genoveva Valentín Soto

Materia: Derecho Laboral

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Confederación de Organizadores
de Puerto Rico
Peticionarios                                             Certiorari

v.
                                                    CC-2006-171
Servidores Públicos Unidos de
Puerto Rico
Recurrida


Opinión del Tribunal emitida por el Juez Asociado señor Rivera García.


En San Juan, Puerto Rico, a 28 de marzo de 2011.

El presente recurso de *certiorari* nos brinda la oportunidad de examinar los contornos jurisdiccionales de un árbitro obrero-patronal al momento de conceder remedios en una disputa sujeta a la mediación laboral. Específicamente, debemos resolver si, al disponer el convenio colectivo que el laudo arbitral debe ser *conforme a derecho* y al permanecer silente en torno a las facultades remediales conferidas a un árbitro, éste último se excede en sus poderes al otorgar a un obrero despedido injustificadamente la reposición en su antiguo puesto y el cobro de los ingresos dejados de percibir para el periodo durante el cual estuvo destituido.

Por entender que en el caso que nos ocupa la árbitra estaba limitada a conceder el remedio exclusivo de la mesada, dispuesto por la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185 *et seq.*), confirmamos la decisión emitida por el Tribunal de Apelaciones.[1] Así, resolvemos en esta ocasión que en todo convenio colectivo que exija que el laudo sea *conforme a derecho* y no se exprese sobre las facultades remediales del árbitro, procede entonces conceder, ante un despido injustificado, la indemnización mínima que dispone la Ley Núm. 80, *supra*, sin más; entiéndase, la mesada.

I

El Sr. Anselmo Lugo Reyes laboraba desde el 29 de septiembre de 1997 como organizador sindical de Servidores Públicos Unidos de Puerto Rico (SPU), una organización obrera afiliada a AFSCME-AFL-CIO y dedicada a la sindicación de empleados públicos en Puerto Rico según la Ley Núm. 45 de 25 de febrero de 1998, conocida como la Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico, 3 L.P.R.A. secs. 1451-1454a. El 25 de marzo de 2002, SPU despidió al señor Lugo Reyes por alegadas violaciones al Reglamento de Personal de la organización. Concretamente, se le imputó haberse expresado verbalmente y por escrito con un lenguaje despectivo y discriminatorio

---

[1] El Tribunal de Apelaciones le confirió deferencia a la determinación de la árbitra de que el despido, en efecto, fue injustificado, pero revocó la otorgación de los remedios de reposición del empleado en su antiguo puesto y la concesión de los haberes dejados de percibir mientras éste estuvo destituido.

contra los líderes y presidentes de uniones laborales asociadas con SPU, en particular, contra el Director Ejecutivo y el Director de Organización de la recurrida.[2] Además, SPU fundamentó su decisión de destitución en el alegado desempeño deficiente del señor Lugo Reyes en la realización de sus deberes y funciones.

Al momento de los hechos, los organizadores sindicales de SPU, entre ellos el señor Lugo Reyes, estaban constituidos colectivamente bajo la Confederación de Organizadores de Puerto Rico (COPR), que desde 1999 era el sindicato y la representante exclusiva de la unidad apropiada compuesta por éstos. Las relaciones obrero-patronales entre COPR y SPU se regían por un convenio

_____

[2] Según imputado por SPU, el señor Lugo Reyes violentó el Art. XI, B(1) y (2), violaciones 3, 8 y 19 del Reglamento de Personal para los Empleados de Servidores Públicos Unidos de Puerto Rico, AFSCME (SPU). Apéndice, Pet. de *certiorari*, págs. 3-4. Estas disposiciones prohíben que un empleado realice un acto o use lenguaje amenazante, indecente u obsceno contra compañeros de trabajo o miembros de SPU; que incurra en conducta impropia dentro o fuera del trabajo de tal naturaleza que afecte el buen nombre, refleje descrédito o ponga en dificultad a SPU/AFSCME, o que realice o fomente prácticas de hostigamiento sexual en el empleo. Ante una violación de estas disposiciones, el Reglamento provee para un método de disciplina progresiva, donde el empleado estará sujeto a diferentes tipos de sanciones dependiendo de la frecuencia de la infracción. Íd.

De acuerdo al laudo de arbitraje del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos (Negociado), SPU alegó que "el 1 de febrero de 2002, en las oficinas centrales de SPU, el señor Lugo Reyes hizo expresiones despectivas y discriminatorias en contra de la Sra. Gladys Pérez Santiago, Secretaria Tesorera de la Unión de Personal Administrativo Secretarial y de Oficina (PASO), afiliada a SPU". Íd., págs. 6 y 8. Asimismo, se le imputa al señor Lugo Reyes haber distribuido el 25 de febrero de 2002, en las oficinas centrales de SPU, un boletín titulado *Los pichones le tiran a las escopetas*, el cual contenía lenguaje ofensivo y peyorativo hacia varios líderes y presidentes de uniones locales afiliadas a la SPU, incluyendo al Director Ejecutivo y de Organización de ésta. Íd., pág. 7. Finalmente, SPU alegó que el señor Lugo Reyes fue transferido de una campaña organizativa a otra por no cumplir adecuadamente con sus funciones. Íd., pág. 11.

colectivo vigente desde el 12 de marzo de 2002 hasta el 31 de diciembre de 2003.[3]

En el Art. X (F) y (H) sobre *Quejas y Agravios* del referido convenio colectivo, las partes habían acordado que "en aquellos casos en que un empleado [considerara] injusto su despido, [debería] presentar su querella por escrito, acudiendo directamente al tercer paso del procedimiento para la tramitación de querellas".[4]   Éste último paso disponía que "el asunto [fuera] sometido al Negociado de Conciliación y Arbitraje" (Negociado) para que un árbitro emitiera un laudo "por escrito y *conforme a derecho*" que pusiera fin a la disputa.[5]

Amparándose en el procedimiento dispuesto en el referido convenio, la COPR, en representación del señor Lugo Reyes, presentó una solicitud de arbitraje ante el Negociado alegando que su despido había sido en violación al convenio colectivo vigente al momento de los hechos. Al disponer un acuerdo de sumisión, las partes no lograron

---

[3] Luego del despido del señor Lugo Reyes y de quedar el caso sometido para ser resuelto por la árbitra, SPU y COPR acordaron un nuevo convenio colectivo el cual fue firmado el 16 de enero de 2004. Apéndice, Alegato de la parte recurrida, págs. 2-41.   En éste   -a diferencia del convenio colectivo aplicable a los hechos del caso de autos- las partes pactaron expresamente que un empleado que fuese despedido injustificadamente sería acreedor de los remedios de reposición en el empleo y el cobro de los haberes dejados de percibir durante el término de la destitución.   Íd., Véase Apéndice II, Alegato de la Parte Recurrida, Íd., Convenio Colectivo firmado el 16 de enero de 2004 entre COPR y SPU, Art. X, H-5, pág. 14.

[4] Convenio Colectivo firmado el 12 de marzo de 2002 entre y por SPU y la COPR, págs. 10-13, Apéndice, Petición de *certiorari*, págs. 133-137.

[5] Íd. A diferencia del convenio pactado el 16 de enero de 2004, este convenio nada disponía sobre la facultad del árbitro para conceder los remedios de restitución en el empleo y la paga de los haberes dejados de percibir durante el tiempo en el cual estuvo destituido.

un consenso respecto al asunto que debía resolverse.[6] Por lo cual la árbitra, Elizabeth Guzmán Rodríguez, fundándose en el Reglamento para el Orden Interno de los Servicios de Arbitraje del Negociado,[7] dispuso que la controversia a resolver era "si el despido del Sr. Anselmo Lugo Reyes, estuvo o no justificado. De no estarlo, que el Árbitro [aplicara] el remedio adecuado".[8]

Concretado así el acuerdo de sumisión, la vista de arbitraje se celebró el 1 de julio y el 13 de agosto de 2003. Luego que ambas partes presentaran prueba testifical y documental en la vista celebrada el 13 de mayo de 2004, la árbitra emitió su laudo. El dictamen de

---

[6] SPU propuso como proyecto de sumisión lo siguiente: "[d]eterminar por la Honorable Árbitro si el despido del querellante, estuvo o no justificado, a base de la conducta reiterada de éste, en denigrar y afectar la imagen de SPU y sus miembros, así como a base de la prueba presentada. La Honorable Árbitro proveerá el remedio adecuado". Apéndice, Petición de *Certiorari*, pág. 2. Por su parte, la COPR propuso como proyecto de sumisión lo siguiente:

> [q]ue la Honorable Árbitro determine si el despido del Sr. Anselmo Lugo Reyes, tuvo o no justa causa. De resolver que el despido fue injustificado, que la Honorable Árbitro declare con lugar la querella y consecuentemente, ordene a la parte querellada que le satisfaga al Sr. Lugo Reyes, los siguientes remedios apropiados: reposición en el empleo, salarios dejados de percibir, estipendio de automóvil, 'per diems' de avanzada de la campaña de la Administración de Rehabilitación Vocacional, reembolso de los gastos de plan médico que el Patrono le pagaba, cualquier otro beneficio que aparezca en el Convenio Colectivo, y sobre la cuantía total, que se adjudique como remedios económicos, un 25% de honorarios de abogado y pagar al querellante una suma igual a la que se adjudique por salarios y demás haberes dejados de devengar, como penalidad automática por Ley". Íd., págs. 2-3.

[7] El Reglamento para el Orden Interno de los Servicios de Arbitraje del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos (Negociado), dispone que "[e]n la eventualidad de que las partes no logren un acuerdo de sumisión, dentro de un término razonable, el árbitro determinará el asunto preciso a ser resuelto tomando en consideración el convenio colectivo, las contenciones de las partes y la evidencia admitida". Art. IX (b), Reglamento Núm. 6065, 27 de septiembre de 1999, págs. 6-7.

[8] Apéndice, Petición de *certiorari*, pág. 3.

ésta modificó la sanción de despido impuesta por SPU a una suspensión de empleo y sueldo por treinta días laborables, y ordenó la reposición del señor Lugo Reyes a su antiguo puesto con el pago de todos los haberes dejados de percibir por el periodo de tiempo durante el cual estuvo destituido.

Así las cosas, el 10 de junio de 2004 SPU acudió al Tribunal de Primera Instancia solicitando la revisión del laudo. En esencia, alegó que la árbitra erró al resolver que tenía autoridad para ordenar la reinstalación del señor Lugo Reyes y el pago de todos los salarios y beneficios que éste dejó de devengar, e impugnó la determinación de que el despido fue injustificado.

El 5 de abril de 2005 el foro primario dictó su sentencia en la cual sostuvo la determinación de la árbitra sobre el despido injustificado del señor Lugo Reyes. Sin embargo, revocó la orden de reinstalación de éste en su antiguo puesto, al igual que el cobro de salarios dejados de percibir. Fundamentó su decisión en el entendimiento de que en un laudo emitido *conforme a derecho* sólo aplicaba el remedio exclusivo de la mesada provisto por la Ley Núm. 80, *supra*.

El 17 de agosto de 2005, mediante un recurso de *certiorari*, la parte peticionaria impugnó la decisión del juzgador de instancia ante el Tribunal de Apelaciones. El 23 de diciembre de 2005 el foro apelativo intermedio confirmó al tribunal sentenciador. Mediante un recurso de

*certiorari*, la controversia ahora se encuentra ante nuestra consideración.

En su petición de *certiorari*, el señor Lugo Reyes arguye que el Tribunal de Apelaciones

> ... cometió error craso y manifiesto en derecho, al dictar Sentencia final. Ello se debe a que no procedía reafirmar la modificación del Laudo arbitral, sino ponerlo en pleno vigor, ante el hecho de que en el presente caso, si el Convenio Colectivo sí requería justa esta [sic] causa para el despido del co-peticionario Lugo, la Árbitr[a] Guzmán Rodríguez tenía indudable discreción adjudicativa para ordenar los referidos remedios apropiados de reposición y pago retroactivo de salarios y demás haberes dejados de devengar.... págs. 8-9.

De acuerdo con este trasfondo fáctico, procedemos a examinar el derecho aplicable a la controversia reseñada.

II

A. *La Ley de Relaciones del Trabajo de 1945*

La aprobación de la Ley de Relaciones del Trabajo, Ley Núm. 130 de 8 de mayo de 1945 (Ley Núm. 130), 29 L.P.R.A. sec. 61 *et seq.*, según enmendada, marca el inicio del desarrollo de la legislación obrero-patronal en Puerto Rico. Véase D. Fernández y C. Romany, <u>Derecho laboral: casos y materiales</u>, República Dominicana, Ed. U.P.R., 1987, T. 1, pág. 13. La referida disposición legal encuentra su origen en los postulados de su homóloga federal, la *National Labor Relations Act* de 1935, conocida como la Ley Wagner (29 U.S.C. sec. 151 *et seq.*, según enmendada), aunque difiere de ésta esencialmente en

ciertos aspectos.[9]   Íd., pág. 39.   Véase, también, E.M.

Toledo, Leyes de relaciones del trabajo, Hato Rey, Ed.

Situm, 2000, págs. 3-4.

En su Sec. 62, la Ley Núm. 130, *supra*, establece como

política pública del Gobierno de Puerto Rico *fomentar la*

*negociación colectiva*[10] para alcanzar el máximo desarrollo

---

[9] Al igual que la Ley Núm. 130 de 8 de mayo de 1945 (Ley Núm. 130), 29 L.P.R.A. sec. 61, según enmendada, *et seq.*, la *National Labor Relations Act de 1935*, conocida como la Ley Wagner (29 U.S.C.A. sec. 151, *et seq.*), "fomenta la práctica de la negociación colectiva y la amplia y absoluta libertad de organización de los trabajadores, como medios para facilitar el libre flujo de los bienes en el comercio...". D. Fernández y C. Romany, Derecho laboral: casos y materiales, República Dominicana, ed. U.P.R., 1987, T.1, pág. 33. Véase, también, M. C. Harper, S. Estreicher y J. Flynn, Labor Law: Cases, Materials, and Problems, 6ta ed., New York, Aspen, 2007, págs. 86-88 ("Prominent among the purposes... of the [National Labor Relations Act (NLRA)]... is the prevention of industrial strife. ... By providing an administrative procedure for resolving recognitional disputes, the Act helped reduce industrial conflict. ... The NLRA assumes that inequality of bargaining power can be corrected by protecting worker's ability to obtain collective representation").

Posteriormente, la Ley Wagner fue enmendada por la *Labor Management Relations Act de 1947*, conocida como la Ley Taft-Hartley (29 U.S.C.A. sec. 141-197). D. Fernández y C. Romany, *op. cit.*, pág. 33. Véase, también, E. M. Toledo, Leyes de relaciones del trabajo, Hato Rey, ed. Situm, 2000, págs. 3-4. Esta disposición legal trajo consigo variadas limitaciones al movimiento sindical que había florecido bajo la Ley Wagner, ya que las uniones habían perdido la confianza de la población norteamericana. Íd. Véase, también, M. C. Harper, S. Estreicher y J. Flynn, *op. cit.*, págs. 88-91 ("The Taft-Harley amendments to the NLRA... were in part a response to the strike wave of late 1945 and 1946 and the widespread public perception of abuse of union power. ... The 1947 amendments marked a clear shift in tone from the original Wagner Act, from a measure reflecting affirmative support of unionization and collective bargaining to one that appeared to take a more neutral interest of all workers").

Entre otros cambios a la Ley Wagner, la Ley Taft-Harley declaró ciertas prácticas de las uniones como ilícitas; permitió que los patronos llevaran quejas a la Junta Nacional de Relaciones del Trabajo y estableció reglas para la operación, el manejo y las actividades de las uniones. Toledo, *op. cit.*, págs. 4-5. Véase, también, González Sotomayor v. Mayagüez Resort & Casino, 2009 T.S.P.R. 140, en las págs. 9-10, 176 D.P.R. ___ (2009).

[10] La negociación colectiva se define como
"[e]l proceso de discusión, trato y ajuste entre un patrono o varios patronos y una unión o sindicato o varias uniones, para concertar un convenio colectivo en el cual se incluyan salarios, condiciones de trabajo, seguridad de la unión y otros beneficios, así como el arreglo por arbitraje de los problemas originados durante la vigencia del convenio". M.M. Ballester, Vocabulario obrero-patronal, San Juan, Dept. del Trabajo del E.L.A., 1962, pág. 59.

de la producción de nuestro país y así lograr los niveles

más altos de vida posible para nuestra población, así como

la consecución de la paz industrial, los salarios y las

condiciones de empleo adecuados para los obreros

puertorriqueños, y la producción ininterrumpida de

artículos y servicios.[11]   29 L.P.R.A. sec. 62.   Véanse,

---

[11] Específicamente, la Sec. 62 establece que:
"[l]a política pública del Gobierno de Puerto Rico, en lo que respecta a las relaciones entre patronos y empleados y a la celebración de convenios colectivos, es la que a continuación se expresa:

"(1) Es necesidad fundamental del pueblo de Puerto Rico alcanzar el máximo desarrollo de su producción a fin de establecer los niveles más altos de vida posibles para su población en continuo crecimiento; es la obligación del Gobierno de Puerto Rico adoptar aquellas medidas que conduzcan al desarrollo máximo de esa producción y que eliminen la amenaza de que pueda sobrevenir el día en que por el crecimiento continuo de la población y la imposibilidad de mantener un aumento equivalente en la producción tenga el pueblo que confrontar una catástrofe irremediable; y es el propósito del Gobierno desarrollar y mantener tal producción mediante la comprensión y educación de todos los elementos que integran el pueblo respecto a la necesidad fundamental de elevar la producción hasta su máximo, de distribuir esa producción tan equitativamente como sea posible; y *es asimismo el propósito del Gobierno desarrollar en la práctica el principio de la negociación colectiva, en tal forma que pueda resolverse el problema básico de la necesidad de una producción máxima.*

"(2) *Paz industrial, salarios adecuados y seguros para los empleados, así como la producción ininterrumpida de artículos y servicios, a través de la negociación colectiva, son factores esenciales para el desarrollo económico de Puerto Rico. El logro de estos propósitos depende en grado sumo de que las relaciones entre patronos y empleados sean justas, amistosas y mutuamente satisfactorias y que se disponga de los medios adecuados para resolver pacíficamente las controversias obrero-patronales.*

"(3) A través de la negociación colectiva deberán fijarse los términos y condiciones de empleo. A los fines de tal negociación, patronos y empleados tendrán el derecho de asociarse en organizaciones por ellos mismos escogidas.

"(4) Es la política del Gobierno eliminar las causas de ciertas disputas obreras, fomentando las prácticas y procedimientos de la negociación colectiva y estableciendo un tribunal adecuado, eficaz, e imparcial que implante esa política.

también: <u>A.E.E. v. U.T.I.E.R.</u>, 170 D.P.R. 564, 571 (2007);

<u>Plan de Salud U.I.A. v. A.A.A.</u>, 169 D.P.R. 603, 608-609

(2006).  Lo anterior es cónsono con los origines y las

motivaciones de la legislación inspiradora de la Ley Núm.

130 -la Ley Wagner- la cual fue promulgada en respuesta a

la Gran Depresión económica de 1929, con el fin de

estimular que los patronos y las uniones se sentaran en la

mesa de negociación y alcanzaran acuerdos justos que

propendieran a mayores niveles de producción y a un

mejoramiento de la economía estadounidense.  Véase M.C.

Harper, S. Estreicher y J. Flynn, <u>Labor Law: Cases,</u>

<u>Materials, and Problems</u>, 6ta ed., New York, Aspen, 2007,

págs. 86-88 ("Senator Wagner and some of his advisers were

certainly of the view that labor organization and

collective bargaining could help increase the purchasing

power of workers and thereby lift the nation out of

[economic] [d]epression").

Asimismo, hemos establecido que la Ley Núm. 130,

*supra*, se promulgó con el objetivo adicional de

"[reconocer] y [proteger] los derechos de los obreros a

---

"(5) *Todos los convenios colectivos vigentes, y los que se hagan en el futuro, por la presente se declaran instrumentos para promover la política pública del Gobierno de Puerto Rico en su esfuerzo de fomentar la producción hasta el máximo; y se declara que como tales están revestidos de un interés público*. El ejercicio de los derechos y el cumplimiento de las obligaciones de las partes en dichos convenios colectivos quedan, por tanto, sujetos a aquella razonable reglamentación que sea necesaria para lograr las normas públicas de este subcapítulo".  (Énfasis nuestro).  Ley de Relaciones del Trabajo, Ley Núm. 130 de 8 de mayo de 1945 (Ley Núm. 130) (29 L.P.R.A. sec. 62).

organizarse, negociar colectivamente y llevar a cabo actividades concertadas para su propio beneficio". Cervecería Corona, Inc. v. Junta de Salario Mínimo de P.R., 98 D.P.R. 801, 806-807 (1970). Véanse, también: A.A.A. v. Unión de Abogados de la A.A.A, 158 D.P.R. 273, 283-284 (2002); F.S.E. v. J.R.T., 111 D.P.R. 505, 512 (1981). Así surge de su historial legislativo y de su exposición de motivos, los cuales manifiestan que la Asamblea Legislativa perseguía, con la promulgación de la Ley Núm. 130, *supra*, "fomentar la igualdad de poder contratante entre patronos y empleados; ... proveer la conciliación, la mediación y el arbitraje; ... [d]efinir y evitar prácticas desleales de trabajo[, y] proveer la solución de disputas obreras". Exposición de Motivos de la Ley Núm. 130, *supra*, 1945 Leyes de Puerto Rico 407. Véanse, también: P. del S. 737 de 23 de marzo de 1945, 1ra Sesión Ordinaria, 16ta Asamblea Legislativa, Actas del Senado de Puerto Rico, pág. 314; Actas de la Cámara de Representantes, domingo, 15 de abril de 1945, págs. 1690 y 1925.

El Art. 4 de la legislación bajo examen materializa la intención legislativa previamente expuesta, al disponer que

> [l]os empleados tienen derecho, entre otros, a organizarse entre sí; a constituir, afiliarse o ayudar a organizaciones obreras; negociar colectivamente a través de representantes por ellos seleccionados; y dedicarse a actividades concertadas con el propósito de negociar

colectivamente u otro fin de ayuda o protección mutua.  29 L.P.R.A. sec. 65.[12]

Más aún, estas garantías son protegidas vehementemente por disposiciones intrínsecas a la propia Ley Núm. 130, *supra*.  Por ejemplo, "[e]l Art. 8(1)(a) de dicha ley (29 L.P.R.A. sec. 69(1)(a) (2009)) dispone que es una práctica ilícita de trabajo el que un patrono intervenga, restrinja, ejerza coerción o intente intervenir, restringir, o ejercer coerción con sus empleados en el ejercicio de [los derechos consagrados en el Art. 4 antes citado]".  J.R.T. de P.R. v. Morales, 89 D.P.R. 777, 779 (1964).

De todo lo anterior se deducen dos fundamentos básicos que le otorgan a Ley Núm. 130, *supra*, su razón de ser.  Primero, la legislación laboral bajo análisis persigue de forma vigorosa que el vehículo de la negociación colectiva sea el medio idóneo *para alcanzar acuerdos pacíficos entre los obreros y sus patronos, que*

---

[12] El Art. 4 de la Ley Núm. 130, *supra*, 29 L.P.R.A. sec. 65, es idéntico en su naturaleza a la Sec. 7 *originalmente* legislada en la Ley Wagner.  Fernández y Romany, *op. cit.*, pág. 33.  Véase, también, Toledo, *op. cit.*, págs. 3-4.  La Sec. 7 de la Ley Wagner disponía originalmente que:
> [e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or mutual aid or protection. D. Fernández y C. Romany, *op. cit.*, pág. 33.

El propósito central de la Sec. 7 de la Ley Wagner consistía en otorgar a los trabajadores estadounidenses tres derechos fundamentales, a saber: (1) el derecho a la organización; (2) el derecho a la negociación colectiva, y (3) el derecho a la celebración de huelgas y piquetes pacíficos.  Íd.  Estos derechos eran implementados por otras disposiciones de la Ley Wagner las cuales declaraban ciertas prácticas del patrono como ilícitas y prohibían la coacción o intervención de éste con los empleados en el ejercicio de los derechos consignados en la Sec. 7.  Íd.

*repercutan en un ambiente industrial funcional y operante,*
*y respondan primordialmente a las necesidades de*
*desarrollo y consumo del pueblo puertorriqueño.* Segundo,
el legislador también se propuso garantizar que el obrero
puertorriqueño pudiese gozar de determinados derechos
fundamentales (específicamente, la organización y
negociación colectiva, y la celebración de actividades
concertadas) que lo habiliten para negociar en igualdad de
condiciones con su patrono. Véase T.J. St. Antoine, *The*
*Collective Bargaining Process*, en American Labor Policy: A
Critical Appraisal of the National Labor Relations Act,
ed. Charles J. Morris, Washington D.C., BNA Books, 1987,
pág. 215 ("collective bargaining was conceived in the
wide-spread belief that both the cause of industrial peace
and the welfare of the individual employee would be
promoted if workers were given a genuine voice in
determining their employment conditions"). A la luz de lo
anterior, cualquier interpretación de la Ley Núm. 130,
*supra*, requerirá una fidelidad rigurosa a estos dos
fundamentos.

B. *La organización y negociación colectiva: derechos de*
*rango constitucional*

Aunque la Ley Núm. 130, *supra*, crea un andamiaje
legal que vindica el derecho de los obreros a organizarse
y a negociar colectivamente, en el 1952 la Asamblea
Constituyente entendió prudente perpetuar tales derechos
incluyéndolos en nuestra Constitución. Es por ello que en

Puerto Rico -a diferencia de la jurisdicción federal- el derecho a la organización y a la negociación colectiva "tiene raíces y abolengo constitucional". J.R.T. v. Asoc. C. Playa Azul I, 117 D.P.R. 20, 33 (1986). Véanse, también: U.P.R. v. Asoc. Pur. Profs. Universitarios, 136 D.P.R. 335, 350 (1994); J.R.T. v. Asoc. Servs. Médicos Hosp., 115 D.P.R. 360, 364 (1984), citando a A.A.A. v. Unión de Empleados A.A.A., 105 D.P.R. 437 (1976); J.R.T. v. Club Deportivo, 84 D.P.R. 515 (1962).

Como tal, los padres de nuestra Ley Suprema consagraron expresamente en la Sec. 17 de nuestra Carta de Derechos la garantía cardinal de todo empleado de una empresa privada a la organización y a la negociación colectiva con su patrono. Art. II, Sec. 17, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 375. Particularmente, esta disposición legal dispone que "[l]os trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados *tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar*".[13] (Énfasis nuestro.)

---

[13] Como corolario del derecho fundamental a la organización y negociación colectiva, las Secs. 12, 15, 16 y 18 de nuestra Carta de Derechos añaden garantías indispensables para el movimiento obrero puertorriqueño. Así, la Sec. 12 prohíbe la esclavitud y cualquier forma de servidumbre involuntaria. Art. II, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 364. La Sec. 15 no permite "el empleo de menores de catorce años en cualquier ocupación perjudicial a la salud o a la moral o que de alguna manera amenace la vida o

Al otorgarse un rango constitucional al derecho a la
negociación colectiva, la referida Ley Núm. 130, *supra*, ha
ejercido un rol complementario al Art. 17 de nuestra Carta
Magna, sirviendo como la herramienta idónea "para
implementar las garantías y derechos reconocidos [a los
obreros puertorriqueños] en nuestra Constitución". <u>J.R.T.</u>
<u>v. Asoc. Serv. Médicos Hosp.</u>, 115 D.P.R. 360, 365 (1984).
"De ahí que las disposiciones [de la Ley Núm. 130, *supra,*]
deben ser interpretadas liberalmente en favor de la
protección y fomento de [los] derechos [consagrados en la
Sec. 17 de la Carta de Derechos], teniendo siempre
presente que [esta Ley es] parte de un esquema amplio y

integridad física". Íd., pág. 368. Por su parte, la Sec. 16 dispone que

> "[s]e reconoce el derecho de todo trabajador a escoger
> libremente su ocupación y a renunciar a ella, a recibir
> igual paga por igual trabajo, a un salario mínimo
> razonable, a protección contra riesgos para su salud o
> integridad personal en su trabajo o empleo, y a una
> jornada ordinaria que no exceda de ocho horas de trabajo.
> Sólo podrá trabajarse en exceso de este límite diario,
> mediante compensación extraordinaria que nunca será menor
> de una vez y media el tipo de salario ordinario, según se
> disponga por ley". Íd., pág. 369.

Igualmente, la Sec. 18 expresa que,

> "[a] fin de asegurar el derecho a organizarse y a negociar
> colectivamente, los trabajadores de empresas, negocios y
> patronos privados y de agencias o instrumentalidades del
> gobierno que funcionen como empresas o negocios privados
> tendrán, en sus relaciones directas con sus propios
> patronos, el derecho a la huelga, a establecer piquetes y
> a llevar a cabo otras actividades concertadas legales...."
> Íd., pág. 377.

Esta red de derechos constitucionales "sirve[] para proteger a distintos grupos de empleados de una conducta patronal históricamente opresiva, prohibir dicha conducta y garantizar ciertos derechos al fortalecer los esfuerzos sindicales de los trabajadores". D.M. Helfeld, <u>La política laboral constitucional del 1952: sus principios</u> <u>esenciales y los factores que la influenciaron</u>, 72 Rev. Jur. U.P.R., 143, 145 (2003).
Amerita indicar que, según expuso el distinguido José Trías Monge, los derechos esbozados en la Sec. 17 del Art. II de nuestra Constitución germinan del Art. 23(4) de la Declaración Universal de los Derechos del Hombre de las Naciones Unidas. J. Trías Monge, <u>Historia Constitucional de Puerto Rico</u>, San Juan, Ed. Universitaria, Vol. III., 1982, pág. 201.

abarcador encaminado a implantar la directriz constitucional". J.R.T. v. Asoc. C. Playa Azul I, supra, pág. 33, citando a Junta Rel. Trabajo v. Club Deportivo, supra, pág. 519.

El Informe de la Comisión Permanente de la Carta de Derechos de la Asamblea Constituyente (Comisión) arroja luz en torno a los principios laborales esenciales que los redactores de la Constitución pretendían surcar de forma indeleble en la Sec. 17 de nuestra Carta de Derechos, *supra*. Allí, la Comisión manifestó lo siguiente:

> [e]l conjunto de derechos que aquí se consigna tiene como eje central el propósito de proveer al trabajador una manera eficaz y práctica para contratar con su patrono. El trabajador, tomado por sí solo, no está en posición económica de discutir de igual a igual con su patrono las condiciones de su empleo. El convenio colectivo mediante representantes de su propia selección, brinda al trabajador individual un instrumento equiparador de fuerzas y de responsabilidad; en virtud de él los obreros quedan constituidos en una unidad y como tal unidad convienen colectivamente con su patrono. Los derechos aquí consignados existen en la actualidad y están expresamente garantizados en las leyes vigentes o implícitamente contenidos en otras disposiciones constitucionales. Se ha creído conveniente consignarlos en la carta de derechos con el fin de prevenir contra posibles vulneraciones futuras. Se reconoce constitucionalmente, en consecuencia, que para los fines de negociar colectivamente con sus propios patronos y para cumplir sus convenios, los trabajadores de empresas y negocios privados y agencias e instrumentalidades del gobierno que operen como empresas o negocios privados tendrán el derecho a organizarse, a efectuar actividades concertadas legales, a establecer piquetes y a ir a la huelga. Informe de la Comisión Carta de Derechos, 4 Diario de Sesiones de la Convención de Constituyentes 2574 (1951).

Surge de las expresiones de la Comisión el interés por posicionar al obrero puertorriqueño en un sitial de poder negociador equivalente al de su patrono. De esta manera, los obreros pueden contratar de forma eficaz y práctica con sus empleadores, sin mayores trabas que el propio acto de la negociación. Además, la concesión a los obreros de las garantías constitucionales del derecho a organizarse, a efectuar actividades concertadas legales, a establecer piquetes y a ir a la huelga, afianza el andamiaje legal a favor de la negociación laboral.

El profesor David M. Helfeld amplía lo anterior al sugerir que el derecho a la negociación colectiva consagrado en la Sec. 17 de nuestra Carta de Derechos, *supra*, (al igual que los derechos consignados en la Sec. 18) se fundamenta en dos premisas elementales, a saber:

> ... en primer lugar, el trabajador individual, por lo general, no posee el mismo poder para negociar que su patrono, ni puede defenderse en contra de tratamiento patronal injusto. La segunda premisa es que el reconocimiento del derecho de los trabajadores a organizarse [y] negociar colectivamente[,]... podría[] colocarlos en la posición de lograr convenios colectivos que resultarían en una distribución más justa de la riqueza que producen y en defender sus intereses más efectivamente. D.M. Helfeld, La política laboral constitucional del 1952: sus principios esenciales y los factores que la influenciaron, 72 Rev. Jur. U.P.R., 143, 145 (2003).

No obstante, a pesar que el derecho a la organización y a la negociación colectiva goza de rango constitucional y su elucidación exige liberalidad "a favor de las protecciones que de él emanan" (A.A.A. v. Unión de

Abogados de la A.A.A., supra, pág. 284), tal derecho "no [es] absoluto[] y debe[] interpretarse 'dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida común'". U.P.R. v. Asoc. Pur. Profs. Universitarios, supra, pág. 362, citando a S.I.U. de P.R. v. Otis Elevator Co., 105 D.P.R. 832, 842 (1977). Véase 4 Diario de Sesiones de la Convención Constituyente 2576 (1951).

Entendiendo el marco legal y constitucional que promueve y faculta la negociación colectiva, pasemos a examinar el instrumento principal utilizado para implantar la política laboral antes esbozada: el convenio colectivo.

C. *El convenio colectivo como instrumento primordial de la negociación sindical*

Un convenio colectivo es "el acuerdo por escrito entre una organización obrera y un patrono en que se especifican los términos y condiciones de empleo para los trabajadores cubiertos por el contrato, el *status* de la organización obrera y el procedimiento para resolver las disputas que surjan durante la vigencia del contrato". M.M. Ballester, Vocabulario Obrero-Patronal, San Juan, Departamento del Trabajo y Recursos Humanos del E.L.A., 1962, pág. 25. Específicamente,

> [t]he collective bargaining agreement ... may be broadly defined as an agreement between a single employer or an association of employers on the one hand and a labor union upon the other, which regulates the terms and conditions of employment. 'Such agreement may be a brief statement of hours of labor and wages, or, on the other hand, it may take the form of a book

> ... or often an exhaustive pamphlet regulating, in the greatest minuteness, every condition under which labor is to be performed, and touching upon subjects such as strikes, lockouts, walkouts, seniority, apprentices, shop conditions, safety devices and group insurance'". L. Teller, Labor Disputes and Collective Bargaining, Nueva York, Ed. Baker, Voorhs & Co., 1940, Vol. I, pág. 476.

"[E]l convenio colectivo es un contrato que, como tal, tiene fuerza de ley entre las partes suscribientes siempre que no contravenga las leyes, la moral y el orden público". J.R.T. v. Junta Adm. Muelle Mun. de Ponce, 122 D.P.R. 318, 333 (1988). Al pactar su contenido, "[las partes] debe[n] cumplir[lo] con estricta rigurosidad". Corp. De P.R. de Difusión Pública v. UGT, 156 D.P.R. 631, 638 (2002), Opinión de conformidad del Juez Asociado Señor Efraín Rivera Pérez. Véanse, también: 29 L.P.R.A. sec. 62; Martínez Rodriguez v. A.E.E., 133 D.P.R. 986, 995 (1993); Rivera Adorno v. Autoridad de Tierras de P.R., 83 D.P.R. 258, 264-265 (1961); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960). "[E]l convenio colectivo obliga al patrono, a la [u]nión y a los miembros individuales de la [u]nión". San Juan Mercantile Corp. v. J.R.T., 104 D.P.R. 86, 89 (1975). Como resultado, "ni el patrono ni los obreros pueden pretender beneficiarse de ciertas cláusulas y rechazar otras". Íd.

A pesar de la naturaleza contractual de los convenios laborales, éstos no pueden catalogarse como meros pactos que articulan derechos individuales de los empleados, sino

que deben considerarse *instrumentos que crean relaciones e intereses a la luz de la política laboral estatal*. Bowen v. U.S. Postal Service, 459 U.S. 212, 220 (1983) ("a collective bargaining agreement is much more than traditional common law employment terminable at will. Rather, it is an agreement creating relationships and interests under the federal common law of labor policy"); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578 (1960) ("The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate").

Consecuentemente, "[l]a Asamblea Legislativa de Puerto Rico ha considerado los convenios colectivos como instrumentos para la promoción de la política pública laboral del Gobierno". J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, pág. 330. Véanse: P.R. Telephone v. Junta Rel. Trabajo, 86 D.P.R. 382 (1962); 29 L.P.R.A. sec. 62(5). "Por dicha razón, los convenios colectivos están revestidos de un alto interés público". Corp. De P.R. De Difusión Pública v. UGT, supra, pág. 639. Ello, pues la celebración de los contratos laborales fomenta "la paz industrial a través de medios adecuados que [ayudan] a resolver de forma pacífica las controversias obrero-patronales". Íd., pág. 638. A la luz de lo anterior, cuando ambas partes, al firmar el convenio colectivo, se

comprometen a someter al procedimiento de arbitraje cualquier queja y agravio que surja entre ellas, tal cláusula las obliga por igual -<u>Pérez v. Autoridad de Fuentes Fluviales</u>, 87 D.P.R. 118, 124 (1963)-[14] y los tribunales estamos llamados a brindar a lo pactado "el más entusiasta endoso" (<u>Unión de la Industria Licorera De Ponce v. Dest. Serralles, Inc.</u>, 116 D.P.R. 348, 352 (1985)).

Ahora bien, debido a que en el caso de autos las partes pactaron someter al procedimiento de arbitraje cualquier controversia que surgiera por el despido de un empleado (Apéndice, Petición de *Certiorari*, págs. 133-137), abordamos a continuación los principios fundamentales del arbitraje obrero-patronal según dispone nuestro ordenamiento legal.

*D. Principios generales del arbitraje obrero-patronal*[15]

---

[14] Como ya hemos expresado,
"[c]uando existe un convenio colectivo y dicho convenio contiene cláusulas para el procesamiento de quejas y agravios ya para su decisión o arbitraje, éstas deben ser observadas por todos los que intervienen en el campo de las relaciones obrero-patronales: los obreros, los patronos, las uniones, la Junta de Relaciones del Trabajo y los tribunales". <u>San Juan Mercantile Corp. v. J.R.T.</u>, 104 D.P.R. 86, 90 (1975).

[15] Según dispone acertadamente el profesor David Helfeld,
"[u]n estudio del derecho de arbitraje en Puerto Rico forzosamente tiene que incorporar tanto el derecho federal como el de Puerto Rico. ... Es así, porque las normas federales del derecho estatutario y jurisprudencial en el campo arbitral ... aplican plenamente en Puerto Rico, con igual fuerza como si fuese un Estado de la Unión. ... [E]l derecho puertorriqueño en este campo ha sido profundamente influido por unos modelos federales y hay que analizar esa influencia para entender el desarrollo jurídico que ha transcurrido. A fin de cuentas, lo que ha resultado en Puerto Rico es un sistema de derecho arbitral con elementos federales y puertorriqueños que interactúan dinámicamente". D. Helfeld, <u>La jurisprudencia creadora:</u>

En su concepción más abarcadora, el arbitraje constituye "la alternativa existente más formal a la adjudicación y [al] litigio judicial. En este proceso, las partes en disputa someten y presentan su caso ante un tercero neutral que está investido con la facultad de rendir una decisión".[16]   D. Fernández Quiñones, <u>El arbitraje obrero-patronal</u>, Colombia, Ed. Legis, 2000, pág. 9. El arbitraje obrero-patronal se distingue –de entre varias modalidades del arbitraje-[17] por ser un "sustituto

_____

<u>factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico</u>, 70 Rev. Jur. U.P.R. 1, 2 (2001).

[16] El tratadista de arbitraje obrero-patronal, Frank Elkouri, establece: "[a]rbitration is a 'simple proceeding voluntarily chosen by parties who want a dispute determined by an impartial judge of their own mutual selection, whose decision, based on the merits of the case, they agree in advance to accept as final and binding'." F. Elkouri y E. Elkouri, <u>How Arbitration Works</u>, 6ta ed., Washington D.C., BNA Books, ed. A.M. Ruben, 2003, pág. 3.
     A diferencia de la mediación, conciliación o transacción –en donde las partes tienen la opción de acoger o rechazar las recomendaciones del tercero mediador o conciliador- en el arbitraje las partes están compelidas por su propio acuerdo de aceptar la decisión del árbitro como final y vinculante. Íd., pág. 7. Contrario a estas figuras afines, el objetivo del arbitraje es la adjudicación y no el compromiso. Íd.

[17] Con relación a la multiplicidad de procesos amparados según el término *arbitraje*, el profesor David Helfeld explica que
     "[l]o que comenzó como un método relativamente sencillo se ha transformado en nuestra época en una gran variedad de procesos, utilizando todos el nombre común de arbitraje. La gama es extensa: el arbitraje entre naciones, el arbitraje comercial internacional y, el arbitraje comercial doméstico, entre otros. Este último está compuesto de diversas ramas tales como la construcción, la banca, la propiedad intelectual, el comercio entre los negocios y el comercio entre las industrias de seguros de valores y de bienes raíces y sus clientes, el arbitraje en el campo de impericia profesional, en el derecho de familia, en disputas relacionadas con el ambiente y por supuesto, en disputas laborales en los sectores privados y públicos, incluyendo controversias en el empleo en casos donde no hay presencia sindical. Se ha extendido el arbitraje de derechos para cubrir también el arbitraje de intereses en el área laboral, y el arbitraje compulsorio a cambio de la prohibición de la huelga, y para mencionar la novedad más reciente, el arbitraje adscrito a los tribunales como parte de un programa de métodos alternos de resolución de disputas". D. Helfeld, *op. cit.*, págs.

del uso de la fuerza económica como solución a las disputas que surjan durante la vida del convenio colectivo" (Íd., pág. 21) y por representar un medio pacífico que hace efectivo el proceso de la negociación sindical.[18]  Íd., pág. 21, citando a H. Shulman, Reason, Contract and Law in Labor Relations, 68 Harv. L. Rev. 999, 1024 (1955).  Véase, también, Textile Workers Union of Am. v. Lincoln Mills, 353 U.S. 448, 455 (1957)("the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike").

Nuestro ordenamiento jurídico favorece vehementemente el uso del arbitraje obrero-patronal como sustituto del litigio judicial.  Como fe de lo anterior,

> la [Ley Núm. 130, *supra*,] ... hace referencia específica al arbitraje en tres ocasiones. Ellas tratan de las prácticas ilícitas del trabajo para patronos y organizaciones obreras que disponen sobre violación de convenio colectivo, que incluye el no acatar un laudo de arbitraje, sea éste producto de un arbitraje delineado en el contrato colectivo o de un procedimiento de arbitraje *ad hoc*. La otra instancia en que se menciona el arbitraje es en la disposición que faculta al organismo administrativo para solicitar el cumplimiento

---

5-6 (2001).  Véase, también, Vivoni Farage v. Ortíz Carro, 2010 T.S.P.R. 206, pág. 13, 179 D.P.R. ___ .

[18] En resumen, sus características esenciales consisten en: (1) ser un juicio de tipo contencioso y adjudicativo; (2) ser un proceso de naturaleza privada –con excepción del arbitraje realizado por el Negociado–; (3) gozar de informalidad y flexibilidad en comparación con el proceso judicial; (4) no requerir el uso de la doctrina del precedente ni los principios de derecho sustantivo –*claro está, siempre y cuando el laudo no se limite a ser emitido conforme a derecho*–; (5) contar con árbitros que poseen un alto grado de peritaje y conocimiento especializado, los cuales emiten laudos merecedores de la deferencia de los tribunales, y (6) representar un proceso menos costoso que el proceso ordinario ante los foros judiciales.  D. Fernández Quiñones, El arbitraje obrero-patronal, Colombia, ed. Legis, 2000, págs. 25-27.

judicial del laudo en el caso en que la parte perdidosa se niegue a acatarlo.  Se implica el arbitraje en la Declaración de Política Pública de la ley al promover que patronos y uniones dispongan de los 'medios adecuados para resolver pacíficamente las controversias'.  Fernández Quiñones, *op. cit.*, pág. 20, citando a 29 L.P.R.A. secs. 61, 62(2) y 69(1)(f) y 2(a).

Igualmente, esta Curia ha establecido que "el arbitraje de las controversias laborales bajo los términos de los convenios colectivos es [una pieza] integrante del proceso de negociación colectiva". Pérez v. Autoridad de Fuentes Fluviales, supra, págs. 124-125.  Como mecanismo de solución de disputas, el arbitraje obrero-patronal representa un medio más apropiado que los tribunales para la resolución de controversias que emanan de la relación contractual entre las partes, ya que es menos técnico, más flexible y menos oneroso. Véase Vélez v. Serv. Legales de P.R. Inc., 144 D.P.R. 673, 682 (1998).  Lo anterior faculta que se cumpla con la política pública laboral imperante en esta jurisdicción, la cual exige que "las controversias laborales tengan rápida adjudicación y pronto fin".  J.R.T. v. P.R. Telephone Co., Inc., 107 D.P.R. 76, 81 (1976).  Es por ello que reconocemos como norma general la política laboral favorable a todo acuerdo de arbitraje que nace de un convenio pactado entre el patrono y la unión.  Vélez v. Serv. Legales de P.R. Inc., supra, pág. 682.

De lo antepuesto surge que el arbitraje laboral es, predominantemente, un producto de la contratación privada entre uniones y patronos.  F. Elkouri y E. Elkouri, How

Arbitration Works, 6ta ed., Washington D.C., BNA Books, 2003, pág. 46.  Como resultado, la decisión de someter la controversia ante un árbitro nace de la voluntad de las partes y no se origina -aunque sí es fomentado- mediante el mandato legislativo.  United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, pág. 582 ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit").  Véase, también, VDE Corp. v. F & R Contractors, Inc., 2010 T.S.P.R. 210, en la pág. 16, 180 D.P.R. ___ (2010).  En nuestra jurisdicción, la inclusión voluntaria del arbitraje en el convenio colectivo es la norma en la mayoría de los contratos sindicales.[19]  Fernández Quiñones, op. cit., pág. 31 ("El arbitraje compulsorio no tiene cabida en el ámbito laboral porque está en pugna abierta con la filosofía imperante de la negociación colectiva. ... Ese tipo de arbitraje se utiliza en la legislación del sector público que le garantiza la negociación colectiva a determinados empleados ...").

Ordinariamente, el arbitraje obrero-patronal constituye el último eslabón de una cadena de eventos pertenecientes a un procedimiento de quejas y agravios

---

[19] "Utilizamos el concepto 'arbitraje compulsorio legislativo' para diferenciar la situación en que el mecanismo de arbitraje es de naturaleza obligatoria por así acordarlo las partes [-arbitraje voluntario-], de cuando su carácter imperativo es por razón de una ley especial".  Colón Molinary v. Autoridad de Acueductos, 103 D.P.R. 143, 145-145 (1974).

previamente delineado en el convenio colectivo.[20]  Elkouri

y Elkouri, *op. cit.*, pág. 198.   En términos generales,

dicho procedimiento consiste en lo siguiente:

> [g]rievances ordinarily are taken by the
> aggrieved employee, ... with ... a union
> representative, to the first line supervisor,
> and if no settlement is reached, [they] may be
> appealed through successive steps of the
> management hierarchy and, in most cases, then
> taken to arbitration.[21]  Elkouri y Elkouri, *op.*
> *cit.*, pág. 214.

El Tribunal Supremo federal se ha expresado sobre tal

procedimiento de la siguiente manera: "[the grievance

procedure] is, in other words, *a part of the continuous*

*collective bargaining process*. It, rather than a strike,

is the terminal point of a disagreement".   United

Steelworkers of America v. Warrior & Gulf Navigation Co.,

supra, pág. 581.

Claro está, es imperativo recordar que, al ser el

procedimiento de quejas y agravios un elemento forjado por

la voluntad de las partes contratantes, cada convenio

contendrá el método de resolución de disputas que mejor

---

[20] "Collective-bargaining agreements commonly provide grievance procedures to settle disputes between union and employer with respect to the interpretation and application of the agreement and require binding arbitration for unsettled grievances".   United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987).

[21] Otros lo plantean de la manera siguiente:
> "[l]abor arbitration's methods have become quite
> standardized.... [T]he overwhelming majority of today's
> collective bargaining relationships provide for ad hoc
> arbitrators or (an increasing trend) for a designated
> panel of arbitrators used in turn. In both cases, the
> union 'owns' the grievance, selects the arbitrator jointly
> with the employer, [and] represents the grievant at the
> hearing".   D. Nolan, *Issues in Labor Arbitration, en*
> American Aribitration Association, Handbook on Labor
> Arbitration, Nueva York, E.d. T.E. Carbonneau & J.P.
> McConnaughay, 2007, pág. 7.

responda a los intereses de éstas. Elkouri y Elkouri, *op. cit.*, pág. 214. Sin embargo, si por alguna razón la disputa sobrevive alguno de los pasos anteriores, la norma general apunta a incluir al arbitraje como el paso final del procedimiento explicado. En ocasiones -como ocurre en el caso de autos- "[l]os contratos proveen para que se omitan etapas con miras a expeditar los agravios. Ello suele acontecer en casos de despido o casos que suscitan cuestiones de seguridad". Fernández Quiñones, *op. cit.*, pág. 36.

*E. La figura del árbitro y las implicaciones de su laudo*

Una vez la disputa es sometida ante un árbitro para su resolución, las partes, en efecto, sustituyen a las cortes por el árbitro "para la determinación de todas las cuestiones de hecho y de derecho sustantivo y renuncian al derecho a litigar tales cuestiones ante los tribunales".[22] López v. Destilería Serrallés, Inc., 90 D.P.R. 245, 256 (1964). Véanse, también: Condado Plaza Hotel & Casino, v. Asoc. de Empleados de Casino de P.R., 149 D.P.R. 347, 352 (1999); Rivera Adorno v. Autoridad de Tierras, 83 D.P.R. 258 (1961); J.R.T. v. Central Mercedita, Inc., 94 D.P.R. 502 (1967); J.R.T. v. N.Y. & P.R. Steamship Co., 69 D.P.R. 782, 800 (1949). Lo anterior se debe a que "[t]he labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion

---

[22] Como veremos, existen contadas excepciones que permiten la revisión judicial del laudo arbitral.

judgments may indeed be foreign to the competence of courts." United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, pág. 581. Además, debemos tener presente que el árbitro goza de un peritaje y conocimiento especializado ajenos a los jueces, el cual agiliza el proceso adjudicativo y garantiza una pronta disposición de la disputa laboral.[23]

El Tribunal Supremo federal ha delineado el carácter de la función del árbitro en el proceso de arbitraje obrero-patronal. Por voz del Juez Douglas, el Foro Supremo federal expuso:

> [a] proper conception of the arbitrator's function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. *He is rather part of a system of self-government created by and confined to the parties*. (Énfasis nuestro). United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, pág. 581.

Como participante de ese *sistema de auto-gobernanza* creado y limitado a las partes, "[l]a función principal del árbitro ... es interpretar las clausulas [del] convenio[] colectivo[]".[24] J.R.T. v. Junta Adm. Muelle

---

[23] El Foro Supremo federal ha reconocido los beneficios que brinda la figura del árbitro por causa del conocimiento especializado que posee. Así, en United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596 (1960), el Tribunal dispuso que:

> the arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level -- *disputes that require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as reflected in particular agreements*. (Énfasis Nuestro).

[24] En J.R.T. v. Junta Adm. Muelle Mun. de Ponce, expresamos que

Mun. de Ponce, supra, págs. 330-331.   Al ejercer esta función, el árbitro debe adherirse a la esencia del convenio colectivo y el acuerdo de sumisión.   J.R.T. v. New York & P.R. Steamship, Co., supra, pág. 804.   Véase, también, Elkouri y Elkouri, *op. cit.*, pág. 428.   ("*The agreement itself is the point of concentration*, and the function of the arbitrator is to interpret and apply its provisions").  Luego de interpretar el contrato colectivo, la decisión final del árbitro estará plasmada en el laudo de arbitraje, el cual "no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos".   J.R.T. v. New York & P.R. Steamship, Co., supra, pág. 797.   Tan pronto se complete y emita el laudo, "[l]a autoridad y jurisdicción del árbitro concluye".   Fernández Quiñones, *op. cit.*, pág. 54.

*F. La revisión judicial de un laudo de arbitraje*

---

[e]l árbitro no está limitado exclusivamente al contenido del convenio, sino que puede hacer uso de otras fuentes *siempre que no se aparte de la esencia del convenio*. La libertad de interpretación del árbitro dependerá de la claridad de las cláusulas del convenio. Una cláusula, cuyo lenguaje parece ser claro, puede ser ambigua si admite que se le dé interpretaciones conflictivas. *Dentro de estas limitaciones*, el árbitro tiene flexibilidad para emitir su interpretación

...

Al interpretar un convenio colectivo, el árbitro debe atribuir al lenguaje utilizado su significado común, salvo cuando se disponga expresamente un significado o definición especial; a los términos técnicos les debe dar su significado usual. *Debe leer el convenio como un todo y cada parte debe interpretarla en referencia a las demás cláusulas*, de forma que le dé efectividad al propósito general del convenio.  Los usos y las prácticas pasadas deben ofrecerle guías significativas para la interpretación de las cláusulas. El árbitro debe perseguir que la interpretación que haga de las disposiciones del convenio arrojen un significado razonable y efectivo de éste. (Énfasis nuestro). 122 D.P.R. 318, 330-331.

Los tribunales confieren gran deferencia a las interpretaciones que haga el árbitro en el laudo de arbitraje en torno a lo acordado en el convenio colectivo. Condado Plaza v. Asoc. Empleados Casinos, 149 D.P.R. 347, 352 (1999). Véanse, también: United Steelworkers v. American Mfg. Co., 363 U.S. 564, 567 (1960); J.R.T. v. Junta Adm. de los Muelles Municipales de Ponce, supra, pág. 325; Elkouri y Elkouri, *op. cit.*, pág. 954. Por tal razón, la revisión judicial de los laudos emitidos en el procedimiento de arbitraje se limitará a instancias en las cuales quede demostrada la existencia de fraude, conducta impropia del árbitro, falta del debido proceso de ley, ausencia de jurisdicción, omisión de resolver todas las cuestiones en disputa o que el laudo sea contrario a la política pública. S.I.U. de P.R. v. Otis Elevator Co., 105 D.P.R. 832, 836 (1977). Véanse, también: Rivera Adorno v. Autoridad de Tierras de P.R., 83 D.P.R. 258, 206 esc. 3. (1961); J.R.T. v. N.Y. & P.R. Steamship Co., supra, pág. 800. Lo anterior implica que "un laudo no puede anularse por meros errores de criterio ya sean éstos en cuanto a la ley o en cuanto a los hechos".[25] Autoridad

---

[25] Tratadistas en derecho laboral han dispuesto que "an arbitral decision, unlike those of courts, is, in theory, subject only to the most limited form of review. The decision of the arbitrator, *acting within the power granted him by the agreement*, is final, and not reviewable on the merits by any court, unless the party attacking the decision can demonstrate fraud, partiality, or misconduct on the part of the arbitrator. So great is the presumption in favor of the finality and validity of the award that the Court has held that the finality provision has sufficient force to surmount even instances of mistake". Marvin Hill, Jr. y Anthony V. Sinicropi,

Sobre Hogares de P.R. v. Tribunal Superior de P.R., 82
D.P.R. 344, 353 (1960).  Véase United Paperworkers Int'l
Union v. Misco, Inc., 484 U.S. 29, 36 (1987).

No obstante, cuando el convenio colectivo dispone que
el laudo sea emitido *conforme a derecho*, la intervención
judicial en la revisión del laudo está ampliamente
justificada.  Fernández Quiñones, *op. cit.*, pág. 566.
Véase, también, J.R.T. v. N.Y. & P.R. Steamship Co.,
supra, págs. 801-802.  Que un laudo sea emitido conforme a
derecho implica que "el árbitro viene obligado a seguir
las reglas de derecho y rendir [su decisión] *a tenor con
las doctrinas legales prevalecientes*".  (Énfasis suplido).
Fernández Quiñones, *op. cit.*, pág. 564, citando a J.R.T.
v. N.Y. & P.R. Steamship Co., supra, pág. 802.  En
términos concretos, esto significa que

> ... el árbitro *no puede ignorar* las normas
> interpretativas de derecho sustantivo emitidas
> por los Tribunales Supremos de Estados Unidos y
> Puerto Rico en el campo de derecho laboral, y
> que se reputarán *persuasivas* las decisiones de
> los tribunales de primera instancia y de
> agencias administrativas, y los laudos y
> escritos de reputados árbitros.  (Énfasis
> nuestro).  J.R.T. v. Hato Rey Psychiatric
> Hospital, 119 D.P.R. 62, 68 (1962).

Por consiguiente, "las decisiones del árbitro [que
sean] contrarias a las leyes y normas interpretativas de
derecho sustantivo, emitidas por los Tribunales Supremos
de Estados Unidos y Puerto Rico en el campo de derecho

---

Remedies in Arbitration, Washington D.C., BNA Books, 1981,
pág. 20.

laboral, invalidan jurídicamente" la decisión arbitral. J.R.T. v. Vigilantes, 125 D.P.R. 581, 593 (1990).

*G. Las facultades remediales de un árbitro cuando el laudo debe emitirse conforme a derecho*

Los tribunales debemos tener presente que, dentro del procedimiento de arbitraje obrero-patronal, las facultades decisorias y remediales del árbitro "emanan del acuerdo de sumisión y del convenio colectivo existente entre patrono y unión". Sonic Knitting Indus., Inc. v. Int'l Ladies Garment, Etc., 106 D.P.R. 557, 561 (1977), citando a J.R.T. v. Otis Elevator Co., 105 D.P.R. 195 (1976); Colón Molinary v. A.A.A., 103 D.P.R. 143, 148-149 (1974); J.R.T. v. N.Y. & P.R. Steamship Co., supra; United Steelworkers v. Enterprise Corp., 363 U.S. 593, 597 (1960). Como tal, cuando el convenio no exige que el laudo sea emitido *conforme a derecho*, los árbitros tienen "amplia autoridad para diseñar un remedio adecuado al laudo que [emiten]; *claro está, siempre y cuando el remedio sea consustancial con el convenio colectivo y el acuerdo de sumisión bajo el cual se actúa*". (Énfasis en el original). H.I.E.Tel. v. Celulares Telefónica, 169 D.P.R. 1, 27 (2006) (Sentencia, Opinión de conformidad, de la Juez Asociada Señora Anabelle Rodríguez Rodríguez).

Esta amplitud de facultades remediales en casos donde *el convenio colectivo no requiere que el laudo sea emitido conforme a derecho*, encuentra su justificación en los casos normativos del Tribunal Supremo federal —mejor

conocidos como la trilogía *Steelworkers*-.[26]    Éstos

establecen que los árbitros disfrutan de una vasta latitud

al momento de otorgar remedios, siempre y cuando el

remedio otorgado *cumpla con la esencia* del convenio

colectivo y el acuerdo de sumisión.   United Steelworkers

v.   Enterprise   Wheel   &   Car   Corp.,   supra.

Concretamente, el máximo foro federal ha expresado lo

siguiente:

> [w]hen an arbitrator is commissioned to
> interpret and apply the collective bargaining
> agreement, he is to bring his informed judgment
> to bear in order to reach a fair solution of a
> problem. This is especially true when it comes
> to formulating remedies. There the need is for
> flexibility in meeting a wide variety of
> situations. The draftsmen may never have thought
> of what specific remedy should be awarded to
> meet a particular contingency. Nevertheless, *an
> arbitrator is confined to interpretation and
> application of the collective bargaining
> agreement; he does not sit to dispense his own
> brand of industrial justice. He may of course
> look for guidance from many sources, yet his
> award is legitimate only so long as it draws its
> essence from the collective bargaining
> agreement. When the arbitrator's words manifest
> an infidelity to this obligation, courts have no
> choice but to refuse enforcement of the award.*
> (Énfasis nuestro).   United Steelworkers v.
> Enterprise Wheel & Car Corp., supra, pág. 597.

En Ludwig Honold Mfg. Co. v. Fletcher, infra, el

Tribunal Federal de Circuito de Apelaciones para el Tercer

Circuito proveyó una definición útil de lo que implica que

un remedio *derive su esencia* del convenio colectivo.   El

Tribunal explicó que

---

[26] United Steelworkers of America v. American Manufacturing Co., 363
U.S. 564 (1960); United Steelworkers of America v. Warrior & Gulf
Navigation Co., 363 U.S. 574 (1960); United Steelworkers of America v.
Enterprise Wheel & Car Corp., 363 U.S. 593 (1960).

> a labor arbitrator's award does 'draw its essence from the collective bargaining agreement' *if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention*; only where there is *a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop*, may a reviewing court disturb the award. Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (1969). Véase, también, Ray J. Schoonhoven, Fairweather's Practice and Procedure in Labor Arbitration, Washington D.C, BNA Books, 1999, pág. 553.

Además, el caso provee que, a diferencia de un simple error en la interpretación del derecho (lo cual no concede justificación alguna para trastocar un laudo de arbitraje), cuando el remedio provisto por el árbitro representa un "*manifest disregard of the law*", éste no es merecedor de la deferencia del Tribunal. (Énfasis nuestro). Ludwig Honold Mfg. Co. v. Fletcher, supra, pág. 1128.

Todo lo anterior establece que, al interpretar el convenio colectivo, los árbitros gozan de la flexibilidad necesaria para crear remedios que respondan a una variedad de situaciones que no fueron atendidas expresamente por las partes en el convenio laboral. Sin embargo, esa flexibilidad no es irrestricta. Las facultades remediales del árbitro, *aun cuando el laudo no exija ser emitido conforme a derecho*, deben obtener su *esencia* del convenio colectivo y del laudo de arbitraje, lo cual requiere que el árbitro examine el convenio a la luz de su lenguaje,

contexto, y cualquier otro indicio de la intención de los contratantes.

Con mayor razón, si un laudo *debe emitirse conforme a derecho*, la *esencia* del convenio exige que el remedio otorgado y la decisión final del árbitro estén condicionados por las disposiciones legales vigentes en nuestro ordenamiento legal, ya que así lo han pactado las partes. Así ocurre con la interpretación del término *justa causa* cuando las partes pactan que el laudo sea emitido *conforme a derecho*. Según el profesor Demetrio Fernández Quiñones,

> [s]i las partes le requieren al árbitro que resuelva conforme a derecho, él vendrá obligado a aplicar las normas y doctrinas legales prevalecientes en esta jurisdicción. Ello implica que el árbitro tendrá que recurrir a la Ley de Despido Injustificado[, Ley Núm. 80, supra,] para obtener la definición sobre justa causa que ha establecido el Tribunal Supremo. Fernández Quiñones, *op. cit.*, pág. 217.

Como resultado, si el término *justa causa* en un convenio que exige que el laudo sea emitido conforme a derecho debe interpretarse según los postulados de la Ley Núm. 80, *supra*, y su jurisprudencia interpretativa, igualmente los remedios que conceda el árbitro en este contexto deberán ceñirse a la indemnización mínima que provee esta ley. A la luz de estas consideraciones, conceder *remedios adicionales*, como la reposición en el empleo y el pago de haberes dejados de percibir durante el periodo de destitución, representa un repudio manifiesto

del derecho aplicable el cual exige corrección judicial, y no un simple error de interpretación legal.

No es la primera vez que este Tribunal se enfrenta a esta controversia. En el pasado, mediante Sentencia y estando divididos en criterios, un número de miembros de este Foro reconoció que un árbitro tenía facultad para conceder el remedio de la reposición de un empleado en su antiguo puesto y el cobro de los salarios dejados de percibir mientras estuvo destituido injustificadamente, *por así disponerlo una lectura integral y expresa del convenio colectivo*. En aquella ocasión, la distinguida compañera y Juez Asociada, Hon. Anabelle Rodríguez Rodríguez, mediante una opinión de conformidad a la cual se unieron el distinguido Juez Presidente, Hon. Federico Hernández Denton y el Juez Asociado, Hon. Jaime B. Fuster Berlingeri, expuso lo siguiente:

> ... cuando el convenio colectivo claramente ordena que el laudo sea conforme a derecho, *sin más*, el remedio exclusivo tiene que ser lo que la [Ley Núm. 80, *supra*], provee; es decir, la mesada.
>                              ...
> Si por el contrario, el convenio colectivo o el acuerdo de sumisión no requieren que el laudo sea conforme a derecho y guardan silencio respecto a la facultad remedial del árbitro, éste podrá conceder el remedio que estime procedente incluyendo la reposición y la paga atrasada. Ello necesariamente debe ser así ya que los árbitros tienen amplia latitud para la confección de remedios que adelanten los objetivos plasmados en el convenio colectivo. Esta facultad está subsumida dentro de su capacidad para formular el remedio apropiado.

H.I.E.Tel. v. Celulares Telefónica, supra, págs. 30-31.[27]

Lo anterior da paso a tres posibilidades, a saber: (1) que el convenio colectivo y el acuerdo de sumisión *no condicionen* el laudo para que sea emitido *conforme a derecho* y que *tampoco dispongan* las facultades remediales del árbitro; (2) que el convenio colectivo y el acuerdo de sumisión *condicionen* el laudo para que sea emitido *conforme a derecho*, y que *expresamente dispongan* que el árbitro puede conceder remedios adicionales como, por ejemplo, la reposición en el empleo y el cobro de salarios dejados de percibir, y (3) que el convenio colectivo o el acuerdo de sumisión *exijan* que el laudo sea emitido *conforme a derecho*, pero que *nada se diga* sobre los poderes del árbitro para diseñar remedios.

La primera de estas posibilidades fue contemplada en J.R.T. v. Securitas, Inc., 111 D.P.R. 580 (1981). Allí, *debido a que el convenio colectivo no disponía que el laudo debía emitirse conforme a derecho*, *y por no limitarse las facultades remediales del árbitro*, reconocimos a éste último la potestad de otorgar como remedio la reposición del empleado destituido en su empleo al igual que la paga de salarios dejados de percibir. Para fundamentar nuestra determinación, dispusimos que:

---

[27] El Juez Asociado, Hon. Francisco Rebollo López, suscribió una opinión de conformidad, a la cual se unió la distinguida compañera Jueza Asociada, Hon. Liana Fiol Matta. La opinión suscrita por dichos jueces reconocía facultades remediales amplias a los árbitros, sin importar que el laudo tuviese que ser emitido *conforme a derecho* o que éste fuese silente en torno a los poderes remediales que reconocía al árbitro.

> [n]o se ha demostrado que la intención
> legislativa [al aprobar la Ley Núm. 80] haya
> sido fijar sanciones máximas exclusivas para
> casos de despido cuando media un convenio
> colectivo y un amplio acuerdo de sumisión sobre
> la justificación de la cesantía. ¿Cómo es que
> puede interpretarse que la legislación sobre la
> mesada ha obedecido por décadas al propósito de
> impedir que un árbitro, bajo un acuerdo de
> sumisión [y un convenio] *que no limite
> claramente sus poderes*, ordene la reposición de
> un empleado y el pago de los sueldos dejados de
> percibir...? (Énfasis nuestro) Íd., pág. 583.
> Véase, también, <u>H.I.E.Tel. v. Celulares
> Telefónica</u>, supra, pág. 30.

Esto implica que, cuando el acuerdo de sumisión o el convenio colectivo *no limiten* los poderes de un árbitro para diseñar remedios, y cuando éstos no exijan que el laudo emitido sea *conforme a derecho*, procede reconocer al árbitro una amplia discreción para la elaboración de remedios que progresen los objetivos concretados en el convenio colectivo.

La segunda posibilidad fue atendida en <u>J.R.T. v. Caribbean Towers, Inc.</u>, 99 D.P.R. 595 (1971). En aquella ocasión analizábamos un convenio colectivo que requería *que el laudo se emitiese conforme a derecho* y concedía al árbitro, *expresamente*, las facultades remediales de reposición en el empleo y paga atrasada. Mediante nuestro dictamen, reconocimos al árbitro la jurisdicción conferida por las partes para que ordenara los remedios señalados, *porque así expresamente lo dispuso el convenio colectivo*. Íd., págs. 597-598. Más aún, en aquella ocasión añadimos que, cuando "[e]n el convenio se especifica que el árbitro viene obligado a decidir conforme a derecho,... [e]l

acuerdo de sumisión unido al convenio establecen ... la ley para las partes en el procedimiento de arbitraje". Íd., pág. 598. Por consiguiente, ante tales condiciones, el árbitro no puede aventurar más allá de los límites jurídicos pactados por las partes.

Relativo a la tercera posibilidad examinada en el caso de autos -que el convenio colectivo o el acuerdo de sumisión *exijan* que el laudo sea emitido *conforme a derecho*, pero que *nada se diga* sobre los poderes del árbitro para diseñar remedios- resolvemos hoy que lo procedente es *limitar el remedio arbitral a la indemnización mínima de la mesada*. Esto es cónsono con la política pública a favor de la negociación colectiva, ya que son las partes y no el árbitro o los tribunales las que han pactado adherirse a lo mínimo que ofrece nuestro ordenamiento jurídico, *sin más*.[28]

*H. La doctrina del remedio exclusivo de la mesada y sus excepciones*

La Ley de Despido Injustificado, Ley Núm. 80, *supra*, provee a todo empleado que trabaje mediante remuneración de alguna clase y que sea contratado por tiempo indeterminado, una compensación por su patrono (comúnmente denominada *mesada*), además del sueldo devengado, en caso de ser despedido sin justa causa.[29] 29 L.P.R.A. sec. 185a.

---

[28] "[T]he parties may ... control the arbitrator's remedy power by ... placing specific limitations on his discretion when interpreting the contract." Marvin Hill, Jr. & Anthony V. Sinicropi, *op. cit.*, pág. 28. De tal manera, al disponer que el laudo debía ser uno conforme a derecho, las partes limitan la discreción del árbitro para formular remedios, permitiendo únicamente el remedio de la mesada.

Al momento del despido del señor Lugo Reyes, la mesada consistía, esencialmente, en otorgar al empleado:

(a) [e]l sueldo correspondiente a un mes por concepto de indemnización si el despido [ocurría] dentro de los primeros cinco (5) años de servicio; el sueldo correspondiente a dos (2) meses si el despido [ocurría] luego de los cinco (5) años hasta los quince (15) años de servicio; el sueldo correspondiente a tres (3) meses si el despido [ocurría] luego de los quince (15) años de servicio;
(b) una indemnización progresiva adicional equivalente a una semana por cada año de

---

[29] La Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. secs. 185a-185m) dispone que

"... se entenderá por justa causa para el despido de un empleado: (a) Que el obrero siga un patrón de conducta impropia o desordenada; (b) La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento; (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado; (d) Cierre total, temporero o parcial de las operaciones del establecimiento. Disponiéndose, que en aquellos casos en que la empresa posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de éstos establecimientos constituirá justa causa para el despido a tenor con esta sección; (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en servicios rendidos al público; (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.
"No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Tampoco se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una suma igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo". Art. 2 de la Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185b.

servicio.[30]    29 L.P.R.A. sec. 185a (ed. 1995)
(Sup. 1997).

Como norma general, el remedio previamente indicado
representa la única compensación disponible para un
empleado contra los actos o las omisiones de un patrono
relacionadas con el despido injustificado.  Rivera v.
Security Nat. Life Ins. Co., 106 D.P.R. 517, 527 (1977).
Véanse, también: Acevedo v. Western Digital Caribe, Inc.,
140 D.P.R. 452, 459 (1996);  Vélez Rodríguez v. Pueblo
Int'l, Inc., 135 D.P.R. 500, 511 (1994).

No obstante, existen tres excepciones a la norma del
remedio único de la mesada, a saber: (1) los remedios
adicionales conferidos por conducta torticera del patrono,
ajena a la mera violación de una disposición de las leyes

---

[30] El Art. 1 de la Ley Núm. 80, supra, 29 L.P.R.A. sec. 185, fue
enmendado por la Ley Núm. 128 de 7 de octubre de 2005.  Hoy, en lo
pertinente, este artículo establece que la mesada consiste en:

"(a) el sueldo correspondiente a dos (2) meses por
concepto de indemnización, si el despido ocurre dentro de
los primeros cinco (5) años de servicio; el sueldo
correspondiente a tres (3) meses si el despido ocurre
luego de los cinco (5) años hasta los quince (15) años de
servicio; el sueldo correspondiente a seis (6) meses si el
despido ocurre luego de los quince (15) años de servicio;

"(b) una indemnización progresiva adicional equivalente a
una (1) semana por cada año de servicio, si el despido
ocurre dentro de los primeros cinco (5) años de servicio;
dos (2) semanas por cada año de servicio, si el despido
ocurre luego de los cinco (5) años hasta los quince (15)
años de servicio; tres (3) semanas por cada año de
servicio, luego de haber completado quince (15) años o más
de servicio.

"Los años de servicio se determinarán sobre la base de
todos los periodos de trabajo anteriores acumulados que el
empleado haya trabajado para el patrono antes de su
cesantía, pero excluyendo aquéllos que por razón de
despido o separación anterior le hayan sido compensados o
hayan sido objeto de una adjudicación judicial". 29
L.P.R.A. sec. 185a.

Para criterios adicionales en torno al modo correcto de computar
la mesada, según lo requiere la ley, véase Ley Núm. 80, supra, 29
L.P.R.A. secs. 185 (d), (j),(g) y (l).

del trabajo (Rivera v. Security Nat. Life Ins. Co., supra, pág. 527); (2) los remedios adicionales provistos por leyes especiales (Vélez Rodríguez v. Pueblo Int'l, Inc., supra, pág. 511), y (3) los remedios adicionales concedidos por un despido cuyo propósito e intención principal sea subvertir una clara política pública del Estado o algún derecho constitucional (Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 192 (1998); Porto y Siurano v. Bentley P.R. Inc., 132 D.P.R. 331, 342 (1992); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 65 (1986)). De no establecer satisfactoriamente alguna de las tres excepciones indicadas, el empleado sólo será acreedor al pago mínimo de la mesada.

La Ley Núm. 130, *supra*, concede al patrono y a la unión la oportunidad de ensanchar la protección mínima que ofrece la Ley Núm. 80, *supra*, al empleado despedido injustamente. Mediante la negociación colectiva, las partes pueden pactar en el convenio que el empleado reciba mayores beneficios y protecciones con relación a su seguridad en el empleo. J.R.T. v. Vigilantes, supra, pág. 593. No obstante, y como ya hemos dispuesto anteriormente, cuando el laudo debe ser uno *conforme a derecho*, tales protecciones acrecentadas deben surgir de forma expresa del convenio colectivo o del acuerdo de sumisión, disponiendo que proceden beneficios más allá de lo mínimo que provee la Ley Núm. 80, *supra*. De lo

contrario, nuestro estado de derecho actual sólo ofrece la mesada.

*I. Penalidades, honorarios, intereses y costas*

Finalmente, surge del expediente que la peticionaria reclama el pago de costas, gastos, intereses legales y honorarios de abogado por temeridad, y honorarios profesionales a razón de un 25% de la cuantía total adeudada al señor Lugo Reyes.[31] Además, la peticionaria arguye que por ley, y como penalidad, el señor Lugo Reyes es acreedor a que el patrono le pague una cantidad igual a la adjudicada por los salarios dejados de devengar durante el término de su destitución.[32] A continuación, esbozamos el derecho aplicable para las figuras reseñadas.

La Ley Núm. 402 de 12 de mayo de 1950 (Ley Núm. 402), 32 L.P.R.A. sec. 3114 *et seq.*, conocida como la Ley de Reclamaciones Laborales, declara que

> [s]erán nulos y contrarios al orden público todos los contratos, convenios o acuerdos en que trabajadores o empleados se obliguen directa o indirectamente a pagar honorarios a sus abogados en casos de reclamaciones judiciales o extrajudiciales contra sus patronos bajo la legislación laboral de Puerto Rico o bajo la legislación laboral del Congreso de Estados Unidos aplicable a Puerto Rico, o al amparo de un convenio de naturaleza individual o colectivo. 29 L.P.R.A. 3117.

---

[31] Alegato de la parte Peticionaria, pág. 15.

[32] Íd., págs. 11-12. Sin embargo, debido a que nuestro dictamen elimina el pago de la partida por salarios dejados de percibir, por ser contrario a las facultades remediales concedidas por el convenio colectivo a la árbitra, no consideraremos el reclamo de COPR de que se penalice al patrono con el pago de una suma igual a los haberes dejados de devengar por el obrero. Por consiguiente, limitaremos nuestra exposición legal a la procedencia de las restantes partidas reclamadas.

La intención legislativa tras la citada disposición legal responde a que "permitir el cobro de honorarios de abogado a los trabajadores o empleados que se ven en la necesidad de reclamar contra sus patronos, ... equivale a permitir que se reduzca el valor de su trabajo en la cantidad que paguen a sus abogados". 32 L.P.R.A. sec. 3114. Como resultado, ante una reclamación laboral en la cual el abogado representa al obrero perjudicado, los honorarios profesionales serán fijados por el tribunal para que el patrono los pague.[33] 32 L.P.R.A. sec. 3115; López Vicil v. ITT Intermedia, 143 D.P.R. 574, 587 (1997).

La Ley Núm. 402, *supra*, omite establecer criterio alguno que guíe a los tribunales en su encomienda de fijar los honorarios de abogado que deberá pagar el patrono. Como resultado, en López Vicil v. ITT Intermedia, supra, mediante el uso de la analogía, salvamos el vacío legislativo antes explicado al resolver que "la cuantía que [podía] recibir el abogado de un trabajador victorioso en una reclamación al amparo de la Ley Núm. 100 [de 30 de junio de 1959 (29 L.P.R.A sec. 146 *et seq.*)] sería el [25%] de la indemnización base concedida al trabajador".[34]

---

[33] Al imponer el pago de estos honorarios, el tribunal debe considerar los siguientes cuatro (4) factores, a saber: (1) que un empleado haga una reclamación a su empleador; (2) que la reclamación surja al amparo de la legislación laboral; (3) que el empleador sea un patrono según lo define la Ley Núm. 402, y (4) que se conceda la reclamación. Ortiz v. Mun. de Lajas, 153 D.P.R. 744, 751 (2001).

[34] No obstante, "[s]i bien la política pública tras [Ley Núm. 402] es fomentar que trabajadores agraviados vindiquen sus derechos, no podemos perder de perspectiva que se trata de casos complejos y costosos, por lo que corresponde compensar justamente a los abogados

Íd., pág. 582. En aquella ocasión arribamos a este porcentaje tomando como punto de referencia el 15% de honorarios de abogado dispuesto por la Ley Núm. 80, *supra*, y comparando el grado de complicación y el costo superior que implica litigar un caso de discrimen bajo la Ley Núm. 100, *supra*, *vis-a-vis* un pleito de despido injustificado bajo la Ley Núm. 80, *supra*. Íd.

La Ley Núm. 80, *supra*, antes de ser enmendada en el 2005, dictaminaba explícitamente que "cuando el tribunal [establecía] que el despido fue efectuado sin justa causa, éste [ordenaría] al patrono depositar una suma para honorarios de abogado, *no menor del quince por ciento (15%) del total de la compensación del trabajador*". (Énfasis en el original). <u>López Vicil v. ITT Intermedia</u>, 143 D.P.R. 574, 587 (1997), citando a 29 L.P.R.A. sec. 185k(b). En el 2005, la Ley Núm. 128 de 7 de octubre alteró el Art. 11 de la Ley Núm. 80, *supra*, sin mencionar un porciento específico para el pago de honorarios, disponiendo en su lugar que, de no existir justa causa para el despido, "el patrono demandado [deberá] deposit[ar] en la secretaría del tribunal ... una cantidad para honorarios de abogado que *nunca será menor del por*

---

de los trabajadores". <u>Lopez Vicil v. ITT Intermedia</u>, 143 D.P.R. 574, 577 (1997). Por ello,

> en aquellas situaciones cuando el abogado estime que el esfuerzo realizado, el impacto o resultado excepcional del caso, o el haber enfrentado una defensa hostil justifican el recibir una cuantía mayor en concepto de honorarios, éste podrá solicitar al tribunal su visto bueno para cobrar una tarifa a base de las horas trabajadas. En dicho caso, el abogado estará obligado a presentar un memorando juramentado en el que detalle las horas trabajadas y la tarifa que habrá de cobrar por hora. Íd., pág. 583.

*ciento del total de la compensación o cien dólares ($100), la que fuere mayor"*.  (Énfasis nuestro).  29 L.P.R.A. sec. 185(k)(b).  Ante la omisión del legislador de explicitar determinado porcentaje, resolvimos en Hernandez Maldonado v. The Taco Maker, Inc., res. 24 de marzo de 2011, mantener la norma previa dispuesta por la Ley Núm. 80, *supra*, antes de ser enmendada en el 2005, la cual proveía para una cuantía por honorarios de abogado *no menor del quince por ciento (15%) del total de la compensación del trabajador o cien dólares, la que sea mayor.*  Como bien dispusimos en el caso reseñado, tal será la norma hasta que la Asamblea Legislativa otra cosa disponga.  Íd.

Cuando un convenio colectivo requiera que el laudo de arbitraje sea emitido *conforme a derecho* y permanezca silente en torno al cobro y pago de honorarios de abogado, si el laudo de arbitraje resuelve que el despido de determinado empleado fue sin justa causa, procede aplicar el contenido mínimo de la Ley Núm. 80, *supra*.  Como tal, no tan sólo la definición del término *justa causa* y la doctrina del remedio exclusivo de la mesada limitarán el laudo de arbitraje que emita el árbitro, sino que, al disponer sobre los honorarios de abogado, éste deberá aplicar la norma dispuesta en Hernandez Maldonado v. The Taco Maker, Inc., supra, la cual exige una cuantía por honorarios de abogado *no menor del quince por ciento del total de la compensación del trabajador o cien dólares, la que sea mayor.*

En cuanto a la imposición de honorarios de abogado e intereses por temeridad, las Reglas de Procedimiento Civil establecen que es imprescindible que la parte contra quien se reclaman tales partidas haya actuado con temeridad o frivolidad. Véase Reglas 44.1(d) y 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. V.[35] Hemos indicado que "el concepto de temeridad se refiere a las actuaciones de una parte que hacen necesario un pleito que se pudo evitar o que provocan la indebida prolongación del mismo". Colón Santos v. Coop. Seg. Múlt. P. R., 2008 T.S.P.R. 32, pág. 10, 173 D.P.R. ___ (2008); Blás Toledo v. Hosp. La Guadalupe, 146 D.P.R. 267, 335 (1998). De igual forma, este Tribunal ha establecido que "un litigante actúa con temeridad cuando con 'terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito'". S.L.G. Flores Jiménez v. Colberg, 2008 T.S.P.R. 90, 173 D.P.R 844, 867 (2008). Véanse: Rivera v. Tiendas Pitusa, 148 D.P.R. 695, 701 (1999); Domínguez v. G.A. Life, 157 D.P.R. 690, 706 (2002).

En Blás Toledo v. Hosp. La Guadalupe, supra, págs. 335-336, esta Curia señaló

---

[35] Ambas reglas conservan el mismo número que ostentaban bajo las anteriores Reglas de Procedimiento Civil de 1979. Al comparar los cambios implementados en las nuevas reglas de 2009, reconocemos que éstos no afectan la sustancia de lo dispuesto en las anteriores reglas de 1979. Cf. Reglas 44.1(d) y 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

[ciertas] instancias bajo las cuales existe temeridad, a saber: (1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (2) defenderse injustificadamente de la acción; (3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad, y (5) negar un hecho que le conste es cierto a quien hace la alegación. Véase Fernández v. San Juan Cement Co., Inc., 118 D.P.R. 713, 719 (1987).

Al imponer honorarios de abogado a la parte temeraria, los tribunales descansarán en su discreción y determinarán la cuantía que aplicarán por: (1) el grado de temeridad; (2) el trabajo realizado; (3) la duración y naturaleza del litigio; (4) la cuantía involucrada, y (5) el nivel profesional de los abogados. R. Hernández Colón, Práctica jurídica de Puerto Rico: derecho procesal civil Sec. 4402 (2010); Blás Toledo v. Hosp. La Guadalupe, supra; Velázquez Ortiz v. U.P.R., 128 D.P.R. 234 (1991); Sucesión de Trías v. Porto Rico Leaf Tobacco Co., 59 D.P.R. 229 (1941).

Por otra parte, la Regla 44.3(a) de Procedimiento Civil de 2009 establece que se impondrán intereses *mandatoriamente en toda sentencia que ordena el pago de dinero*, computados sobre la cuantía de la sentencia desde la fecha cuando se dictó sentencia y hasta que ésta sea satisfecha, incluso las costas y los honorarios de

abogado.[36]   32 L.P.R.A. Ap. V, R. 44.3(a). Véase, también,

Rodríguez Sanabria v. Soler Vargas, 135 D.P.R. 779 (1994).

Según dispone esta regla, el pago de intereses a imponerse

será al tipo que fije por reglamento la Junta Financiera

de la Oficina del Comisionado de Instituciones Financieras

y que esté en vigor al momento de dictarse sentencia.

Véanse: E.L.A. v. Rexco Industries, Inc., 137 D.P.R. 683

(1994); R. Hernández Colón, op cit., Secs. 4301-4303.

Finalmente, la Regla 44.1(a) de Procedimiento Civil de

2009 establece que "[l]as costas le serán concedidas a la

parte a cuyo favor se resuelva el pleito o se dicte

sentencia en apelación o revisión, excepto en aquellos

casos en que se disponga lo contrario por ley o por estas

reglas".[37]   32 L.P.R.A. Ap. V, R. 44.1(a).  En su inciso

(c), la regla citada añade que

> [l]a parte a cuyo favor un tribunal apelativo
> dicte sentencia presentará en la sala del
> Tribunal de Primera Instancia que decidió el
> caso inicialmente y notificará a la parte
> contraria, dentro del termino jurisdiccional de
> diez (10) días contados a partir de la
> devolución del mandato y conforme a los
> criterios establecidos en el inciso (b)
> anterior, una relación o memorando de todas las
> partidas de gastos y desembolsos necesarios
> incurridos para la tramitación del recurso ...
> en el Tribunal Supremo .... Íd.

---

[36] Esta regla conserva el mismo número que ostentaba bajo las anteriores Reglas de Procedimiento Civil de 1979. Al comparar los cambios implementados en las nuevas reglas de 2009, reconocemos que éstos no afectan la sustancia de lo dispuesto en las anterior regla de 1979. Cf. R. 44.3(a) de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III).

[37] Esta regla también conserva el mismo número que ostentaba bajo las anteriores Reglas de Procedimiento Civil de 1979. Al comparar los cambios implementados en las nuevas reglas de 2009, reconocemos que éstos no son pertinentes a la controversia ante nos. Cf. R. 44.3(a) de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Habiendo expuesto el derecho aplicable a las controversias en el caso que nos ocupa, pasamos a resolver la controversia inicialmente esbozada.

III

Luego de examinar los autos elevados, colegimos con el Tribunal *a quo* que el despido del señor Lugo Reyes fue injustificado. Nuestra decisión relativa a este aspecto descansa en la deferencia que le otorgamos a la árbitra en su interpretación del término *justa causa* a la luz de la Ley Núm. 80, *supra*, y nuestra jurisprudencia interpretativa. De tal forma, resta considerar si la árbitra tenía la facultad remedial para conceder los remedios de reposición en el empleo y la paga atrasada. A la par, debemos resolver si procede conceder a la parte peticionaria el cobro de las penalidades, los intereses, los honorarios y las costas reclamadas. Veamos.

A. *Facultades remediales de la árbitra*

En el caso de autos, COPR arguye que la árbitra, a pesar de que el convenio colectivo limitaba el laudo de arbitraje a que fuese emitido *conforme a derecho* y sin importar que el pacto sindical guardara silencio sobre las facultades reparadoras de ésta, estaba facultada a conceder al señor Lugo Reyes los remedios de la reposición en su antiguo puesto, al igual que el cobro de los ingresos dejados de percibir durante el término de su destitución. No le asiste la razón.

Los empleados de SPU, entre ellos el señor Lugo Reyes, ejercieron su derecho constitucional bajo la Sec. 17 de nuestra Carta de Derecho, *supra*, al organizarse colectivamente y negociar con su patrono por vía de la COPR. De tal manera, la COPR, como representante exclusiva de los obreros de SPU, se amparó en las facultades que le concede la Ley Núm. 130, *supra*, y negoció un convenio colectivo con la SPU el cual especificaba, entre otras cosas, los términos y las condiciones de empleo de los trabajadores cubiertos por el contrato, el *status* de la organización obrera y el procedimiento para resolver las disputas que surgieran durante la vigencia del contrato. El acuerdo pactado propendía a la paz industrial e implementaba las garantías y los derechos reconocidos a los obreros puertorriqueños en nuestra Constitución.

Ese convenio colectivo vino a tener fuerza de ley entre las partes contratantes, obligando al patrono, a la unión y a los miembros individuales de la unión al cumplimiento de sus cláusulas y condiciones. A la vez, el convenio colectivo fungió como instrumento para implantar la política pública laboral a favor de la negociación colectiva, quedando revestido de un alto interés público y mereciendo nuestro más alto endoso. En el convenio colectivo entre SPU y COPR, las partes establecieron un procedimiento de quejas y agravios en el cual el arbitraje obrero-patronal sería el vehículo para la resolución de

sus disputas, confiriendo así a un tercero neutral la facultad de rendir una decisión vinculante entre la unión y el patrono. Concretamente, SPU y COPR pactaron que, ante el despido de un empleado, el primer y único paso dentro del procedimiento lo sería el arbitraje obrero-patronal. Así, el árbitro vino a sustituir al juez, ejerciendo su peritaje y conocimiento especializado para la pronta disposición de la disputa laboral.

SPU y COPR pactaron que el convenio sería *conforme a derecho*, y como bien reseñamos en nuestra exposición del Derecho, cuando un laudo está condicionado a emitirse de tal manera, el árbitro debe velar celosamente por el cumplimiento de las reglas jurídicas vigentes en nuestro ordenamiento legal y rendir su decisión a tenor con las doctrinas legales prevalecientes. En nuestra jurisdicción, cuando las partes no han pactado mayores protecciones con relación a la tenencia y seguridad del empleado en su trabajo, ya sea mediante la formulación de un convenio colectivo -según la prerrogativa que les concede la Ley Núm. 130, *supra*- o mediante la articulación de un acuerdo de sumisión que así lo disponga, aplican las protecciones básicas reconocidas por nuestro derecho vigente; entiéndase, el remedio único de la mesada provisto por la Ley Núm. 80, *supra*.

Al disponer el convenio colectivo que el laudo debía ser *conforme a derecho*, y al ser silente en torno a los remedios que la árbitra podía conceder, ésta estaba

limitada por los postulados de la Ley Núm. 80, *supra*, y su jurisprudencia interpretativa. Como tal, la árbitra sólo estaba facultada a conceder el remedio exclusivo de la mesada provisto por la Ley Núm. 80, *supra*, ya que no estaba presente alguna de las tres (3) excepciones antes discutidas relativas a la norma del remedio exclusivo.

Igualmente, al examinar de forma integral el convenio colectivo y el acuerdo de sumisión, no surge de manera expresa que las partes habían pactado que la árbitra tendría facultades remediales mayores a las ya provistas por nuestro ordenamiento legal. Reconocer lo contrario atenta contra la política pública imperante en nuestra jurisdicción en torno a la importancia y el poder vinculante de la negociación colectiva laboral. Como bien expusimos anteriormente, la celebración de convenios colectivos garantiza la paz industrial y la armonía laboral. Conceder amplio margen a un árbitro para que diseñe remedios cuando el laudo está condicionado a emitirse *conforme a derecho* y las partes nada han dispuesto sobre los poderes del árbitro, socava principios básicos de derecho contractual y lesiona el acuerdo de voluntades plasmado en el convenio colectivo.

Al redactar un convenio sindical, ambas partes —el patrono y el representante exclusivo— han llegado a un consenso neutral mediante el cual han renunciado a determinadas posturas o designios, entendiendo que para la sana convivencia laboral resulta más beneficioso "el punto

medio". En el caso de autos, ese "punto medio" se encontraba en condicionar el resultado del proceso de arbitraje a que fuera *conforme a derecho*, con las implicaciones y consecuencias ya explicadas. Un laudo *conforme a derecho* confiere a las partes la certidumbre de que el resultado arbitral estará estrictamente aferrado a los límites de la ley, y que no se concederá un remedio más allá del provisto por nuestro andamiaje jurídico.

Si las partes hubiesen tenido la intención de proveer a todo empleado injustamente destituido los remedios de la reposición en el empleo y la concesión de paga atrasada, *así lo hubiesen reconocido expresamente en su convenio laboral o no hubiesen dispuesto en él que todo laudo arbitral fuese emitido conforme a derecho*. En cambio, si las partes no hubiesen condicionado el convenio colectivo a que fuese *conforme a derecho*, el árbitro gozaría de una facultad amplia para diseñar remedios como los aquí impugnados; claro está, *siempre y cuando tales remedios se derivaran de la esencia del convenio colectivo y el acuerdo de sumisión bajo el cual se actuaba*. Es evidente que este no es el caso ante nos.

Además, una vez caducó el convenio vigente al momento del despido del señor Lugo Reyes, las partes acordaron un segundo contrato colectivo, el cual *expresamente* proveía al árbitro la facultad de conceder la reposición en el empleo y la paga atrasada si éste encontraba que el

despido era injustificado.[38] Lo anterior confirma que en el convenio aplicable al caso de autos, firmado el 12 de marzo de 2002, las partes no tenían la intención de proveerle a la árbitra el poder de conceder la reposición del señor Lugo Reyes en el empleo ni el cobro de salarios dejados de percibir mientras estuvo destituido. Al conceder los remedios indicados, la árbitra operó fuera de su esfera de autoridad.

Confirmar las actuaciones de la árbitra traería incertidumbre e imprecisión al ámbito obrero-patronal. Indubitadamente, la árbitra en este caso abusó de su discreción al distorsionar el significado jurisprudencial de lo que representa un laudo *conforme a derecho* cuando se aventuró más allá de lo consignado en nuestro ordenamiento legal y al adjudicarse prerrogativas remediales que no emanaban de una lectura serena del convenio colectivo y el acuerdo de sumisión. Cabe recordar que el convenio colectivo no sólo es la ley entre las partes, sino el marco jurisdiccional del árbitro. Traspasar más allá de sus límites, cuando éste consigna que los laudos deben ser emitidos *conforme a derecho*, sólo conduce a la distorsión de la voluntad de los contratantes y a la creación de inseguridad jurídica en los sindicatos y patronos, quienes ahora quedan a la merced de un árbitro que puede conferirse poderes más allá del ámbito pactado y de la

---

[38] Véase Apéndice II, Alegato de la parte recurrida, <u>Convenio Colectivo firmado el 16 de enero de 2004 entre COPR y SPU</u>, Art. X, (H-5), pág. 14.

esencia del contrato. Lejos de constituir un simple error de interpretación -el cual no justifica la intervención judicial- las actuaciones de la árbitra representan un repudio manifiesto del Derecho, el cual no merece nuestra deferencia.

En el caso que nos ocupa, lo jurídicamente correcto es revocar los remedios de reposición en el empleo y paga atrasada indebidamente concedidos por la árbitra y limitar la indemnización del señor Lugo Reyes a lo mínimo dispuesto por la Ley Núm. 80, *supra*: entiéndase, la mesada.

## B. *Penalidades, intereses, honorarios y costas*

La peticionaria ha exigido el pago de costas, gastos, intereses legales y honorarios de abogado por temeridad. Igualmente, exige que el patrono solvente los honorarios profesionales de su abogado a razón de un 25% de la cuantía total adeudada al señor Lugo Reyes.

Como bien reseñamos en nuestra exposición del Derecho, de acuerdo con la Ley Núm. 402, *supra*, un abogado no puede cobrar de su cliente los honorarios si éste es un trabajador que insta una reclamación laboral, ya que tal proceder equivale a permitir que se reduzca el valor del trabajo del obrero en la cantidad que pague a su representante legal. Ante tal prohibición, los tribunales están llamados a fijar la cuantía por honorarios profesionales que cobrará el abogado del obrero mediante los criterios que han sido establecidos en nuestra

jurisprudencia o por mandato de ley. El pago de estos honorarios procederá del peculio del patrono.

En el caso de la referida Ley Núm. 80, *supra*, hemos dispuesto en <u>Hernández Maldonado v. The Taco Maker</u>, supra, que los tribunales concederán por concepto de honorarios de abogado una suma *no menor del 15% del total de la compensación del trabajador o $100, lo que sea mayor*. Fundamentándonos en la Opinión indicada, procedemos a resolver que, en el caso de autos, *como mínimo*, aplica conceder por concepto de honorarios de abogados el 15% del total de la compensación obtenida por el obrero. Como resultado, devolvemos el caso al Tribunal de Primera Instancia para que fije los honorarios de abogado según lo dispuesto en esta Opinión.

Relativo al pago de honorarios e intereses por temeridad, encontramos que éstos no proceden por no existir prueba de que SPU actuó de forma frívola o temeraria en el cauce judicial. Las actuaciones de SPU no hicieron necesario un pleito que se pudo evitar ni provocaron la indebida prolongación de este. Al ser un caso resuelto vía opinión por primera vez, SPU estaba justificada en recurrir al foro judicial para litigar su causa de acción.

Por otro lado, debido a que la Regla 44.3(a) de Procedimiento Civil, *supra*, ordena que se impongan intereses legales *mandatoriamente* en toda sentencia que requiera el pago de dinero, procedemos a ordenar que SPU

pague intereses legales desde la fecha en que se dictó sentencia en el Tribunal de Primera Instancia sobre la cuantía de la sentencia (la mesada), incluyendo las costas y los honorarios de abogado. El pago de interés será al tipo que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras y que esté en vigor al momento de dictarse sentencia.

Finalmente, según dispone la Regla 44.1(a) de Procedimiento Civil, *supra*, las costas se concederán a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación. En el caso que nos ocupa, el obrero es la parte victoriosa, ya que éste fue despedido sin justa causa y es acreedor de la mesada, sin importar que eventualmente los remedios que originalmente le fueron conferidos hayan sido reducidos en su valor.

Como resultado, según dispone el inciso (c) de la Regla 44.1, *supra*, ordenamos al abogado del obrero que presente en la sala del Tribunal de Primera Instancia que decidió el caso inicialmente, dentro del término jurisdiccional de diez días a partir de la notificación de esta Sentencia, una relación o memorando de todas la partidas de gastos y desembolsos necesarios en que incurrió para la tramitación del recurso ante este Tribunal. Esta relación o memorando deberá cumplir con los criterios esbozados en el inciso (b) de la Regla 44.1 de Procedimiento Civil, *supra*.

IV

Por los fundamentos antes expuestos, *resolvemos otorgarle deferencia a la determinación arbitral de que el despido del señor Lugo Reyes, en efecto, fue injustificado, pero limitamos el remedio concedido a la mesada que dispone la Ley Núm. 80, supra. Igualmente, el patrono deberá pagar intereses legales desde la fecha en que se dictó sentencia en el Tribunal de Primera Instancia sobre la cuantía de la sentencia (la mesada), incluyendo las costas y los honorarios de abogado. Finalmente, devolvemos el caso al Tribunal de Primera Instancia a los únicos fines de precisar el porcentaje correspondiente por honorarios de abogado y las costas según reseñado en esta Opinión.*

*Se dictará sentencia de conformidad.*

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Confederación de Organizadores de Puerto Rico Peticionarios | Certiorari |
| v. | CC-2006-0171 |
| Servidores Públicos Unidos de Puerto Rico Recurridos | |

SENTENCIA

San Juan, Puerto Rico, a 28 de marzo de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se confirma la sentencia dictada por el Tribunal de Apelaciones en el caso de autos.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre sin opinión escrita de la decisión mayoritaria. La Jueza Asociada señora Fiol Matta emite opinión disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Confederación de Organizadores
de Puerto Rico (COPR)
        Peticionarios

                                    CC-2006-171      *Certiorari*

            v.


Servidores Públicos Unidos de
Puerto Rico (SPU)
            Recurridos



Opinión Disidente emitida por la Jueza Asociada señora
FIOL MATTA



En San Juan, Puerto Rico, a 28 de marzo 2011

        La Opinión del Tribunal limita las facultades que tienen los árbitros para conceder remedios en casos de despidos injustificados cuando está vigente un convenio colectivo y extiende el alcance de la Ley Núm. 80 más allá de sus cauces legislativos para cubrir situaciones no contempladas por la Asamblea Legislativa. Por entender que ello es contrario a la política pública y la legislación sobre relaciones obrero patronales, disiento.

I.

A. Los Dos Ámbitos en las Relaciones Laborales en el Sector Privado[39]

En nuestro sistema comprensivo de relaciones laborales, las relaciones contractuales entre los patronos y sus trabajadores tienen lugar en dos ámbitos, el individual y el colectivo. En el primero, se conforma un contrato individual de trabajo entre el patrono y el empleado, en el cual, por lo general, es el patrono quien establece los términos y condiciones en los cuales el empleado debe realizar su trabajo.[40] Mientras, en el segundo, el contrato laboral es colectivo porque los trabajadores optaron por organizarse sindicalmente para lograr mejores condiciones de trabajo y salario a través de la negociación colectiva.[41]

---

[39] El sector público tiene también estos dos ámbitos, aunque con algunas variantes.

[40] Véase, I. Rivera García, Diccionario de Términos Jurídicos, 3ra Edición, Lexis Nexis, San Juan, Puerto Rico, 2000, pág. 54. A este concepto también se le conoce como contrato de trabajo y se le define de la siguiente forma:

> Es aquel por el cual una persona (llamada trabajador) se obliga, mediante una retribución, a prestar un servicio personal a otra (llamada patrono), bajo la dependencia permanente y dirección inmediata o delegada de ésta. F. Velázquez, Diccionario Laboral, Master Typesetting, Hato Rey, Puerto Rico, 1978, pág. 73.

[41] Más técnicamente, un contrato colectivo se define como sigue:

> Es todo acuerdo escrito relativo a las condiciones de trabajo, celebrado entre un empleador (patrono), un grupo de empleadores, o una o varias organizaciones de empleadores, por una parte, y, por otra parte, una o

Como parte del contrato de trabajo individual, el empleado adquiere una serie de derechos producto de la legislación social que se aprobó para viabilizar las disposiciones constitucionales que conforman el aspecto sustantivo del Derecho Laboral.[42] El conjunto de estos estatutos componen la Legislación Protectora del Trabajo, que define las condiciones *mínimas* de trabajo de los empleados, tales como el máximo de horas de la jornada laboral, el pago de horas extras, el salario mínimo, entre otras.[43] Como regla general, estos derechos tienen vigencia

---

varias organizaciones representativas de los trabajadores interesados. F. Velázquez, *Íd.*, pág. 73.

[42] Véase: A. Acevedo Colom, Legislación Protectora del Trabajo, 8va Edición, Ramallo Printing Bros, San Juan, Puerto Rico, 2005, pág. 5; R. N. Delgado Zayas, Apuntes para el Estudio de la Legislación Protectora del Trabajo en el Derecho Laboral Puertorriqueño, Ramallo Bros. Printing, Inc., San Juan, Puerto Rico, 2005, págs. 2-3. Los derechos laborales constitucionales a los cuales nos referimos son:

Sección 16: Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley. Artículo II, sec. 16, 1 L.P.R.A. sec. 16.

[43] R. N. Delgado Zayas, *Íd.*, pág. 2. La Legislación Protectora del Trabajo es aplicable solamente a los empleados del sector privado y a las corporaciones públicas que funcionan como negocios privados. A. Acevedo Colom, *op.cit.*, pág. 5.

automática, por lo cual existen aunque el trabajador no los reclame.[44]

Cuando el empleado toma la decisión de suscribir un contrato de trabajo colectivo, mantiene los derechos mínimos que adquirió a través de la Legislación Protectora del Trabajo. Sin embargo, la nueva relación contractual colectiva puede ampliar estas protecciones limitadas, al estar cobijada por la Legislación sobre Relaciones Obrero Patronales, cuya aplicación se extiende exclusivamente a los empleados sindicados. Concretamente, esta normativa brinda a los unionados diversos mecanismos para obtener, mejorar y preservar sus condiciones de empleo y salario. Algunos de éstos son las huelgas, los piquetes y la opción de organizarse sindicalmente y negociar colectivamente a través de un representante exclusivo.[45] Además, esta normativa es la que establece las reglas que regirán las relaciones laborales entre patronos y obreros cuando se utilice cualquiera de estos mecanismos.

Como puede observarse, los empleados hacen uso de los mecanismos provistos por la Legislación sobre Relaciones Obrero Patronales para poder lograr mejores beneficios económicos y sociales, o lo que es lo mismo, expandir las protecciones mínimas que impone la Legislación Protectora del Trabajo. Esto implica que los derechos que se

---

[44] R. N. Delgado Zayas, *op.cit.*, pág. 3.

[45] R. N. Delgado Zayas, *op.cit.*, págs. 2; A. Acevedo Colom, *op.cit.*, pág. 5.

adquieren por virtud del contrato de trabajo colectivo no se obtienen de forma automática, como los que surgen cuando se establece un contrato individual.[46] Más bien, son producto de un proceso de negociación, en el contexto de una normativa especial, que convierte la relación originalmente desigual, entre el empleado y el patrono, en una más balanceada.

De acuerdo al Lcdo. Ruy Delgado Zayas, la Legislación Protectora del Trabajo incluye tres componentes principales: (1) la legislación que protege el empleo, (2) la legislación sobre el contrato de trabajo y (3) la legislación sobre seguridad social que abarca los seguros laborales así como la protección de la seguridad y salud en el trabajo.[47] Por ser lo pertinente a esta controversia, nos centraremos en la legislación que protege el empleo.

Como regla general, la Ley Núm. 80 de 1976, conocida como Ley de Despido Injustificado,[48] es la que se encarga, en el ámbito individual, de proteger el empleo de los que laboran en el sector privado.[49] Esta intención se devela

---

[46] R. N. Delgado Zayas, *op.cit.*, pág. 3.

[47] R. N. Delgado Zayas, *op.cit.*, págs. 4-15.

[48] 29 L.P.R.A. sec. 185(a) et. seq.

[49] Aunque, si los patronos despiden a sus empleados del sector privado en violación de ciertas leyes federales y estatales, éstos tendrán derecho a ser reinstalados en sus puestos. Entre las leyes que proveen estos remedios se encuentran: (1) Ley Núm. 3 de 13 de marzo de 1942, según enmendada, conocida como Ley de Protección de Madres Obreras, 29 L.P.R.A. sec. 467; (2) Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como Ley contra

claramente en la exposición de motivos de la ley al proclamar que "[y]a es tiempo que se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo…".[50]

Sin embargo, la Ley Núm. 80 de 1976 no prohíbe el despido injustificado, más bien lo reglamenta, al concederle al empleado una indemnización económica como su único remedio. Esto implica que el propósito o esencia de esta normativa no es prohibir el despido sin causa, sino disuadir al patrono de tomar la decisión de despedir a un empleado injustificadamente.[51] En otras palabras, la protección concreta del trabajo existente bajo esta ley es más bien laxa. Las discusiones de los legisladores al momento de evaluar esta medida evidencian que se trataba, como expresó el senador Hernández González, de "un proyecto puro y simplemente de compensación…" que no imponía la

---

Discrimen en el Empleo, 29 L.P.R.A. sec. 146; (3) Ley Núm. 45 de 18 de abril de 1935, según enmendada, conocida como Ley de Compensaciones por Accidente del Trabajo, 11 L.P.R.A. 1; (4) Ley Núm. 69 de 6 de julio de 1985, conocida como Ley contra el Discrimen por Razón de Sexo en el Empleo, 29 L.P.R.A. sec. 1321; (5) Ley Núm. 138 de 26 de junio de 1968, según enmendada, conocida como Ley de Protección Social por Accidentes de Automóviles, 9 L.P.R.A. sec. 2051; (6) Ley Núm. 17 de 22 de abril de 1988, conocida como Ley contra el Hostigamiento Sexual en el Empleo, 29 L.P.R.A. 155. Véase, A. Acevedo Colom, *op.cit.*, págs. 165-174; R. N. Delgado Zayas, *op.cit.*, págs. 112-114.

[50] Exposición de Motivos de la Ley Núm. 80 de 1976, según enmendada.

[51] C. Zeno Santiago, "El Despido y la Política Social en Nuestro Estado de Derecho", 2000, 34 Rev. Jur. U.I.P.R. 213, 219-220.

obligación de reemplear.[52] Con el proyecto, como expuso claramente el senador Nogueras, se dijo "al patrono que ahora le va a costar un poquito más el salir arbitraria y caprichosamente de un empleado. Y a veces los patronos prefieren pagar un poquito para salir de un empleado por capricho y ese sería aumentar un poquito el costo del capricho".[53]

Esta particularidad no cambió con la enmienda que la Asamblea Legislativa realizó, durante el año 2005, a la Ley Núm. 80 de 1976. Dicha enmienda no incluyó la restitución del empleado al trabajo, como remedio al despido injustificado, ni mucho menos la paga del salario atrasado. Sólo se amplió la "mesada" que el obrero recibiría si fuese despedido sin justa causa, de manera que al patrono se le hiciera más difícil tomar esa decisión. Resultan ilustrativas las expresiones que hizo el representante Reyes Oppenheimer sobre la enmienda:

> …La protección de la Ley Núm. 80 se ha probado que es un remedio poco efectivo para el empleado despedido sin justa causa, en comparación con los beneficios que recibe la empresa al despedir al obrero. …El objetivo de desalentar el despido por razones injustificadas de la Ley Núm. 80 parece no haber tenido éxito. …En muchas ocasiones se ha convertido la indemnización como vía de escape para despedir a los trabajadores en forma injusta y caprichosa. Las enmiendas sugeridas mediante

---

[52] Historial Legislativo del P. del S. 1112 que se convirtió en la Ley Núm. 80 de 30 de mayo de 1976, Diario de Sesiones de la Asamblea Legislativa, 24 de mayo de 1975, pág. 3.

[53] Historial Legislativo del P. del S. 1112 que se convirtió en la Ley Núm. 80 de 30 de mayo de 1976, Diario de Sesiones de la Asamblea Legislativa, 24 de mayo de 1975, págs. 6-7.

este Proyecto, pretenden corregir las injusticias que se cometen por ser el remedio de la indemnización uno exiguo. …La aprobación de esta medida desalentaría lo [sic] despidos que se hacen de forma caprichosa y arbitraria. En menosprecio de lo mejor que tiene nuestra economía su mano de obra. La compensación por despido injustificado hará un balance entre el desarrollo económico y los derechos de los trabajadores desalentando y penalizando la práctica de despidos arbitrarios que no tienen relación con el desempeño y las operaciones del patrono. Debemos entender que la política pública detrás de la mesada, es el de [sic] disuadir el despido injustificado y no como un precio que el patrono está dispuesto a pagar por un obrero sin justificación alguna.[54]

Es evidente que la Ley Núm. 80 de 1976 se aprobó por la Legislatura para regir el ámbito laboral individual, es decir, para proteger al trabajador individual que está en desventaja ante su patrono porque tiene que aceptar las condiciones que éste le imponga. Concretamente, el estatuto se refiere en todo momento a ese empleado individual y es a éste al que otorga el remedio de la llamada "mesada" cuando es despedido de su cargo sin justa causa. Claramente, *el propio texto de la Ley Núm. 80 de 1976 revela que ésta no fue concebida para tratar los problemas que se manifiestan en el ámbito colectivo de trabajo, pues éstos no se dan entre el patrono y el empleado como individuo, sino entre el patrono y los empleados organizados en una organización obrera.*[55]

---

[54] Historial Legislativo del P. de la C. 631, Ley Núm. 128 de 7 de octubre de 2005, Diario de Sesiones de la Cámara de Representantes, 29 de agosto de 2005, págs. 2-3.
[55] Las relaciones obrero patronales incluyen la negociación colectiva, la resolución de diferencias resultantes de la

A pesar de que las leyes propias de ambos ámbitos, el individual y el colectivo, tienen como norte la protección del trabajo existente, los remedios que cada uno provee son totalmente diferentes. Por un lado, la Ley Núm. 80 de 1976, posibilita legalmente los despidos injustificados si el patrono paga cierta cantidad de dinero, conocida como la "mesada".[56] Por el contrario, en el ámbito colectivo sólo se tolera el despido si el patrono lo realiza por justa causa.

La negociación colectiva, concretada en el convenio colectivo y aplicada efectivamente y de forma continuada a través del arbitraje obrero patronal, tiene como esencia y objetivo, no la reglamentación del despido, sino *la protección efectiva de la tenencia del empleo existente*. De lo contrario, no tendría ninguna finalidad ampliar y mejorar los beneficios laborales de los obreros. Por eso,

---

interpretación y aplicación del convenio, términos y condiciones de trabajo". F. Velázquez, *op.cit.*, pág. 228.

[56] La Ley Núm. 80 de 1976 es una modificación de la doctrina del empleo a voluntad ("employment at will") de los Estados Unidos. En términos generales, los empleados contratados bajo esta doctrina no tienen derecho legal a la seguridad y continuidad de su empleo. Éstos pueden ser despedidos en cualquier momento o por cualquier razón, por justa o sin justa causa, siempre y cuando no cuenten con un contrato a término fijo, sin que puedan llevar alguna acción legal en contra del patrono. La Ley 80 modifica esta doctrina de inseguridad laboral y le impone al patrono el pago de una mesada cuando el despido es injustificado. Véase, Otero Burgos v. Interamerican Univ., 558 F. 3d 1, 7-8 (2009); Hoyos v. Telecorp Commc'ns, Inc., 488 F. 3d 1, 6 (1st Cir. 2007); Hernández Barreto v. ITT World Directories, Inc. 62 F. Supp. 2d 387, 394 (1999). Véase, además, R. Delgado Zayas, *op.cit.*, págs. 110-111.

los trabajadores que opten por organizarse y negociar colectivamente pueden ampliar el derecho mínimo de la indemnización económica que la Ley Núm. 80 del 1976 concede en el ámbito de la relación contractual individual. La razón de ser de la negociación colectiva le obliga a no tolerar el despido injustificado y a reparar efectivamente su ocurrencia, permitiendo que el trabajador sea reinstalado en su puesto y, en muchos casos, reciba la paga atrasada.

La política pública que promueve las relaciones obrero patronales y la negociación colectiva para el sector corporativo de las agencias gubernamentales y el sector privado no cubierto por la normativa federal, la encontramos en la Ley Núm. 130 del 8 de mayo de 1945, conocida como la Ley de Relaciones del Trabajo de Puerto Rico.[57] Este estatuto se basa principalmente en la Ley Nacional de Relaciones Laborales del 5 de julio de 1935, mejor conocida como Ley Wagner.[58]

El mecanismo de la negociación colectiva se conceptuó tan positivamente que los convenios colectivos fueron declarados "instrumentos para promover la política pública del Gobierno" y, como tales, fueron revestidos de un

---

[57] 29 L.P.R.A. sec. 62 et. seq.; D. Fernández y C. Romany, Derecho Laboral: Casos y Materiales, Tomo I, Editorial de la Universidad de Puerto Rico, Río Piedras, Puerto Rico, 1987, pág. 39.

[58] E. López Ruyol, El A,B,C del Movimiento Obrero, Instituto Técnico Sindical, Inc., Carolina, Puerto Rico, 1998, pág. 201.

interés público.[59] Se visualizaba al convenio colectivo como el mecanismo más importante de la negociación colectiva, que "representa el triunfo de la negociación sobre la fuerza [y el] de la razón sobre la intransigencia".[60] Además, el convenio es un contrato que tiene fuerza de ley entre quienes lo acuerdan, siempre que no sea contrario a la ley, la moral o el orden público, y sus normas obligan tanto al patrono como a la unión y a sus miembros.[61] De esta forma, se incorporan a los contratos individuales las condiciones de trabajo convenidas, "como expresión del efecto regulador del convenio al que ha conducido la negociación".[62] Por esto, este Tribunal ha manifestado que la validez y eficacia de estos contratos "debe ser siempre objeto del más entusiasta endoso por parte de los tribunales".[63]

---

[59] 29 L.P.R.A. sec. 62 (5); Véase, además, J.R.T. v. Junta Adm. Muelle Mun. de Ponce, 122 D.P.R. 318, 330 (1988); Nazario v. Tribunal Superior, 98 D.P.R. 846, 851 (1970); P. R. Telephone v. Junta Rel. Trabajo, 86 D.P.R. 382, 395 (1962).

[60] U.I.L. de Ponce v. Dest. Serrallés, Inc., 116 D.P.R. 348, 352 (1985).

[61] J. R. T. v. Vigilantes, Inc., 125 D.P.R. 581, 592 (1990); J.R.T. v. Corp. de Crédito Agrícola, 124 D.P.R. 846, 849 (1989); J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, pág. 333; Nazario v. Tribunal Superior, supra, pág. 853; Rivera Adorno v. Autoridad de Tierras, 83 D.P.R. 258, 264 (1961).

[62] M. Alonso García y otros, La Solución de los Conflictos Colectivos de Trabajo, Instituto de Estudios Económicos, Madrid, España, 1975, pág. 92.

[63] U.I. L. de Ponce v. Dest. Serrallés, Inc., supra, pág. 352.

La negociación colectiva también se adoptó por su potencial de convertirse en un mecanismo capaz de balancear los intereses de todas las partes y de redistribuir el poder y la riqueza entre todos los sectores. Por eso, los empleados obtuvieron el derecho de asociarse en organizaciones obreras de su preferencia para que éstas los representaran ante sus respectivos patronos.[64] Estas organizaciones obreras, que usualmente se conocen como uniones o sindicatos, están constituidas por los mismos trabajadores "para su protección y con el objeto de negociar colectivamente con los patronos sobre salarios, condiciones de trabajo y demás beneficios y reinvindicaciones", además de todo lo referente a disputas y a quejas y agravios.[65] Esta posibilidad de lograr términos y condiciones de empleo que resulten más justos para los empleados es la esencia de la negociación colectiva.[66]

La política pública laboral dispuesta en la Ley de Relaciones del Trabajo de Puerto Rico fue incorporada y expandida en la Carta de Derechos de la Constitución del

---

[64]   29 L.P.R.A. sec. 65.

[65]  Véase: 29 L.P.R.A. sec. 63 (10); F. Velázquez, *op.cit.*, pág. 256.

[66]  29 L.P.R.A. sec. 62 (3); C. Zeno Santiago y V. M. Bermúdez Pérez, <u>Tratado de Derecho del Trabajo</u>, Tomo I, Publicaciones JTS, San Juan, Puerto Rico, 2003, pág. 33. De lo contrario, la unión "no pasará de ser un club o asociación cívica, a pesar de lo rimbombante del nombre que utilice." E. López Ruyol, *op.cit.*, pág. 62.

Estado Libre Asociado aprobada en 1952, específicamente, en las siguientes disposiciones:

> Sección 17: Los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar.[67]
>
> Sección 18: A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales. …[68]

Las expresiones de los delegados a la Convención Constituyente mientras consideraban estas medidas constitucionales confirman la importancia que otorgaban a la negociación colectiva y su intención de que ésta sirviera para que los trabajadores pudieran obtener beneficios laborales mejores y mayores que los mínimos dispuestos por ley. *Así lo expresó el delegado Paz Granela, al reconocer que "el convenio colectivo puede mejorar, por convenio de las partes[,] las mismas condiciones que dispone la ley".*[69] La intención de los constituyentes de facultar a los trabajadores para que se

---

[67] *op.cit.*, 1 L.P.R.A. sec. 17.

[68] *op.cit.*, 1 L.P.R.A. sec. 18.

[69] Diario de Sesiones de la Convención Constituyente de Puerto Rico, Informes Carta de Derechos, Tomo 3, 4 de enero de 1952, pág. 1622.

organizaran y pudieran negociar colectivamente mejores condiciones de empleo y salario ante sus patronos, se percibe también en el Informe de la Carta de Derechos, que hace énfasis en que: "El conjunto de derechos que aquí se consigna tiene como eje central el propósito de proveer al trabajador una manera eficaz y práctica para contratar con su patrono".[70]

Ante este marco conceptual, ha sido obligatorio concluir que los convenios colectivos son un mecanismo efectivo *para conceder mayores beneficios a los trabajadores unionados que los que provee la legislación laboral del ámbito individual aprobada por la Asamblea Legislativa.*[71] En el contexto específico de los despidos injustificados, varios estudiosos del Derecho Laboral coinciden en que los empleados con derecho a negociar colectivamente tienen una protección más real y concreta que la que disfrutan los trabajadores que sólo tienen derecho a la "mesada". Esta es la indemnización máxima que se puede obtener en el ámbito laboral individual. Sobre este particular, el profesor Acevedo Colom ha expresado:

> [E]l remedio de reposición en casos de despido injustificado es objeto de negociación colectiva diariamente en nuestros país, y en los casos en que media un convenio colectivo a esos efectos, este remedio resulta más abarcador que según lo dispone la legislación vigente. En el campo del

---

[70] Diario de Sesiones de la Convención Constituyente de Puerto Rico, Informes Carta de Derechos, Tomo 4, 14 de diciembre de 1951, pág. 2574.

[71] J. R. T. v. Vigilantes, Inc., *supra*, págs. 590, 592-593.

arbitraje obrero-patronal la restitución o reposición en el empleo es una de las reclamaciones o controversias más comunes.[72]

Precisamente, la posibilidad de convenir colectivamente conlleva la extensión y ampliación de los derechos concedidos por ley. En efecto: "Uno de los incentivos de la organización sindical y la negociación colectiva es ofrecerle a las partes un marco de referencia que trasciende lo legislado. No se negocia un convenio colectivo meramente para volcar *verbatim* la legislación laboral aplicable".[73]

Indiscutiblemente, en términos de los remedios disponibles para el trabajador, existe una brecha gigantesca entre el ámbito individual y el colectivo de las relaciones laborales del sector privado. Hay una clara diferencia entre un trabajador individual y un trabajador organizado sindicalmente. El primero puede ser despedido injustificadamente si el patrono está en disposición de pagar el monto de su mesada. Mientras, el segundo está amparado por el espíritu de la negociación colectiva orientado a conceder mayores y mejores condiciones de

---

[72] A. Acevedo Colom, *op.cit.*, pág. 165. Véase, además, C. Zeno Santiago y V. M. Bermúdez Pérez, *op.cit.*, págs. 152, 162.

[73] A. Torres Rivera, "Despido y Derecho a Reposición y Paga Retroactiva cuando el Convenio Colectivo requiere que el Laudo sea Conforme a Derecho: Desde el Arbitraje Laboral", Rev. Col. de Abog de P.R., Vol. 67, Núm. 4, Octubre – Diciembre, 2006, pág. 188, citando la comparecencia del Secretario del Trabajo y Recursos Humanos, Román Velazco, ante el Tribunal Supremo como Amicus Curiae en el caso de H.I.E.Tel. v. Celulares, 169 D.P.R. 1 (2006).

empleo y salario, lo que incluye la protección efectiva del empleo existente mediante su reposición en el empleo. La fragilidad del trabajador individual es obvia y es precisamente por eso que la Ley Núm. 80 de 1976 fue creada para protegerlo.

La seguridad de empleo que ofrece la negociación colectiva, a través de un convenio colectivo, es incompatible con la alternativa que la Ley Núm. 80 de 1976 provee a los patronos de comprar con una mesada el derecho a la tenencia de un empleo que disfruta un trabajador. El trabajador organizado sindicalmente no necesita de la Ley Núm. 80 de 1976. De hecho, *la aplicación de ésta en su ámbito representaría una pérdida significativa de los derechos que le provee el convenio colectivo.*

Nuestra jurisprudencia ha reconocido esta realidad. Hemos resuelto que la Ley 80 "no aplica cuando están involucrados los convenios colectivos".[74] Al así expresarnos, evidentemente no hemos pretendido aseverar que el *mínimo* protegido por la Ley 80 es inaplicable a casos que envuelven convenios colectivos. Todo lo contrario, ha sido un reconocimiento de que la Ley 80 no limita ni establece el tope obligatorio cuando se trata de un remedio al amparo de un convenio colectivo. En otras palabras, no es comparable el esquema de remedios provistos por la Ley 80 con las facultades considerablemente más amplias que

---

[74] Saúl Vélez Rodríguez v. Pueblo International, Inc. y Otros, 135 D.P.R. 500, n. 11 (1994).

tienen los árbitros en el contexto colectivo. Así resolvimos en J.R.T. v. Securitas, Inc.,[75] al afirmar que "[e]n Puerto Rico hemos distinguido *tajantemente* entre los derechos bajo un convenio colectivo y los derechos de mesada".

### B. El Arbitraje Obrero Patronal: Una Herramienta Indispensable en la Negociación Colectiva

El arbitraje es uno de los métodos alternos a la intervención judicial para la solución de conflictos. Existen diversas modalidades de arbitraje, entre las cuales se encuentra la que se encarga de resolver disputas obrero patronales. En los Estados Unidos esta institución se desarrolló grandemente después de la segunda guerra mundial, con la aprobación de Ley Federal de Relaciones del Trabajo de 23 de junio de 1947, conocida como la Ley Taft-Harley.[76] Mientras, en Puerto Rico, el arbitraje laboral se estableció dos años antes, en la Ley Núm. 130 de 1945.

El arbitraje laboral puede ser compulsorio o voluntario. La primera modalidad, conocida también como arbitraje compulsorio legislativo, se activa cuando surge un tranque en el proceso de negociación del convenio colectivo. Su carácter imperativo surge por causa de una

---

[75] 111 D.P.R. 580, 583 (1981) (Énfasis suplido), citando a Rivera v. Security Nat. Life Ins. Co., 106 D.P.R. 517 (1977). Wolfe v. Neckwear Corporation, 80 D.P.R. 537 (1958).

[76] D. Fernández Quiñones, El Arbitraje Obrero-Patronal, *op.cit.*, págs. 18-19.

ley especial.[77]  Aquí las partes no pueden acudir al recurso de la huelga o cierre patronal y tienen que esperar la determinación del árbitro en torno al tranque en la negociación.

El arbitraje obrero patronal voluntario se caracteriza por ser un procedimiento de naturaleza contractual, a través del cual el patrono y el representante exclusivo de los trabajadores se obligan a someter ante un tercero neutral la controversia que tienen entre sí, de manera que éste proceda a resolverla.  Ambas partes se encargarán de definir no tan solo el pleito que someterán al árbitro sino también sus facultades.  Una vez las partes se someten a este procedimiento deberán respetar el laudo del árbitro.[78]

En Puerto Rico existe una vigorosa política pública a favor del arbitraje obrero patronal como mecanismo para resolver los conflictos que se originan entre patronos y empleados.[79]  Tal deferencia se debe, primero, a que es un mecanismo adjudicativo menos técnico, más flexible y más

---

[77] Colón Molinary v. A.A.A., 103 D.P.R. 143, 146 (nota 1) (1974).  Un ejemplo del arbitraje obrero patronal compulsorio es el que está incluido en la Ley Núm. 45 de 25 de febrero de 1998 que es el estatuto que le garantiza el derecho a negociar colectivamente a los empleados del sector público que laboran en las agencias del gobierno central, pero no tienen el derecho de participar en huelgas.

[78] E. López Ruyol, *op.cit.*, pág. 76.  Véase, además, H.R. Cancio, *Íd.*, pág. 14; D.M. Helfeld, *op.cit.*, pág. 5.

[79] C.F.S.E. v. Unión de Médicos, 170 D.P.R. 443, 448 (2007); U.G.T. v. Corp. Difusión Púb., 168 D.P.R 674, 682 (2006); Martínez Rodríguez v. A.E.E., 133 DPR 986, 995 (1993); J.R.T. v. Corp. Crédito Agrícola, *supra*, pág. 849.

costo efectivo que el proceso judicial; segundo, porque es el mecanismo que se encarga de mantener la estabilidad laboral y, tercero, porque es parte importante de nuestro sistema de relaciones laborales, ya que es un aspecto integral de la negociación colectiva.[80]

Según explica el Prof. Hiram R. Cancio, el arbitraje obrero patronal, más que un sustituto de los tribunales, es un sustituto de la huelga y "un complemento o parte integrante de la negociación colectiva, procedimiento éste que, de acuerdo a la política pública del Gobierno de Puerto Rico y de los Estados Unidos, es el mejor medio para lograr la paz industrial".[81] En definitiva, el arbitraje obrero patronal, al ser producto de la negociación colectiva, también está revestido de un alto interés público.

C. El Árbitro y su Facultad para Conceder Remedios Adecuados

El árbitro es la figura clave para resolver las disputas que se suscitan en el contexto obrero patronal.

---

[80] *C.F.S.E. v. Unión de Médicos*, supra, pág. 449; *U.G.T. v. Corp. Difusión Púb.*, *supra*, pág. 682; *J.R.T. v. Hato Rey Psychiatric Hosp.*, 119 D.P.R. 62, 68 (1987); *U.I.L. de Ponce v. Dest. Serrallés, Inc.*, supra, págs. 353-354; *S.I.U. de P. R. v. Otis Elevator Co.*, 105 D.P.R. 832, 836 (1977); *Nazario v. Tribunal Superior*, *supra*, pág. 851.

[81] H.R. Cancio, *Íd.*, pág. 25, 81. Véase además, *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 575, 578 (1960) y *United Steelworkers v. Enterprise Wheels & Car Corp.*, 363 U.S. 593 (1960).

En cierto sentido, el árbitro es el sustituto del juez.[82]

Desde un punto de vista técnico jurídico, se ha dicho que

el árbitro es un "[j]uez imparcial que las partes en

controversia seleccionan o aceptan para someterles [sic] y

para que resuelva las cuestiones en litigio que no hayan

podido ser resueltas a través de la negociación colectiva

directa…".[83]   Se entiende que las personas escogidas como

árbitros tienen la experiencia y el conocimiento

especializado sobre el ámbito laboral colectivo, lo cual

incluye las organizaciones obreras y todos los mecanismos

que conforman las relaciones obrero patronales.[84] Comparten,

también, la preocupación de que la relación laboral entre

las partes perdure, una vez emitido el laudo.

La facultad del árbitro para adjudicar controversias

obrero patronales se la otorga el convenio colectivo y el

pacto de sumisión.[85] Por tanto, son las partes quienes

---

[82] Condado Plaza v. Asoc. Emp. Casinos P.R., 149 D.P.R. 347, 352 (1999); D. Fernández Quiñones, "Análisis del Término 2006-2007 Tribunal Supremo de Puerto Rico: Derecho Laboral", 77 Rev. Jur. U.P.R. 677, 679 (2008).

[83] F. Velázquez, op.cit., pág. 27.   Véase, además, A. Merchán Álvarez, El Arbitraje: Estudio Histórico Jurídico, Universidad de Sevilla, 1981, págs. 67-77.

[84] D. Fernández Quiñones, "La Legitimación del Arbitraje-Obrero Patronal", Vol. 62, Núms. 3 y 4, RCAPR, diciembre 2001, págs. 451-452.

[85] U.G.T. v. Corp. Difusión Púb., supra, pág. 683; Sonic Knitting Industries v. I.L.G.W., 106 D.P.R. 557, 562 (1977); Colón Molinary v. A.A.A., supra, págs. 148-149; López v. Destilería Serrallés, 90 D.P.R. 245, 256 (1964); J.R.T. v. N.Y. & P.R. S/S Co., 69 D.P.R. 782, 802 (1949). Véase, además, United Steelworkers v. Enterprise Corp., 363 U.S. 593, 597 (1960).

determinan las reglas procesales y el marco normativo en el
cual debe actuar el árbitro.   El tratadista Frank Elkouri
lo explica como sigue:

> Arbitration exists as a private alternative to
> the courts.  As such, the rules are those drafted
> .  .  . by the parties themselves.  They are
> private rules, and the party chosen to interpret
> and apply them --the arbitror-- is an individual
> who draws his or her authority from the
> collective bargaining agreement, or the
> agreement, to submit the matter to arbitration.
>  As such, private-sector parties are free to
> control the degree to which the arbitror is to
> consider external law, including statutes and
> regulations, in deciding cases.[86]

En el caso ante nosotros, el Convenio Colectivo entre
la SPU y la COPR claramente dispone que si la disputa entre
el empleado y el patrono no se puede solucionar mediante el
procedimiento interno de quejas y agravios, el asunto será
sometido al Negociado de Conciliación y Arbitraje del
Departamento del Trabajo y Recursos Humanos.[87] De acuerdo a
la reglamentación que rige los trabajos de esta unidad
administrativa, el árbitro tendrá la responsabilidad de

---

[86] F. Elkouri y E. Elkouri, How Arbitration Works, 6ta
Edición, The Bureau of National Affairs, Inc., Washington,
D.C., 2003, pág. 486.

[87] Exhibit I del recurso de revisión ante el TPI presentado
por la SPU, Artículo X: Quejas y Agravios y Arbitraje, H
(Tercer Paso), Convenio Colectivo entre y por Servidores
Públicos Unidos de Puerto Rico AFSCME, AFL-CIO y la
Confederación de Organizadores de Puerto Rico, 10 de junio
de 2004, pág. 135.

modificar, revocar o confirmar la medida disciplinaria impuesta por el patrono, de forma final y obligatoria.[88]

De ordinario las partes someten en conjunto el pacto o acuerdo de sumisión que define el asunto concreto que el árbitro debe resolver.[89] Si esto no ocurre, el árbitro tiene la potestad de elaborar la controversia, considerando "el convenio colectivo, las contenciones de las partes y la evidencia admitida".[90] En este caso, como la SPU y la COPR no pudieron acordar un pacto de sumisión conjunto, la árbitra Guzmán Rodríguez determinó que el asunto a resolver era "[d]eterminar si el despido del señor Lugo Reyes, estuvo o no justificado [y  d]e no estarlo, que la árbitro apli[cara] el remedio adecuado".[91]

Para resolver la disputa y conceder un remedio, el árbitro tiene la obligación de *interpretar* el convenio colectivo.  Esta es su función principal y al realizarla debe tener "el debido cuidado que exige su investidura".[92]

---

[88] Departamento del Trabajo y Recursos Humanos, Artículo III: Propósito (a), <u>Reglamento Núm. 6065 para el Orden Interno de los Servicios de Arbitraje del Negociado de Conciliación y Arbitraje</u>, 23 de diciembre de 1999, pág. 2.

[89] Departamento del Trabajo y Recursos Humanos, Artículo II: Definiciones (9), *Íd.*, pág. 2.

[90] Departamento del Trabajo y Recursos Humanos, Artículo IX: Acuerdo de Sumisión (b), *supra*, págs. 6-7.

[91] Apéndice I del recurso de *certiorari*, Laudo de Arbitraje, *supra*, pág. 3.

[92] <u>J.R.T. v. Junta Adm. Muelle Municipio de Ponce</u>, *supra*, págs. 330-331, citando a  F. Shulman, "Reason, Contract and Law in Labor Relations", 69 Harv. Law Rev., 1956, pág. 999;

La idea es que el árbitro pueda lograr conferirle significado y sentido a las disposiciones del convenio, de forma cónsona con las preferencias negociadas por las partes contratantes.[93] En palabras sencillas, el árbitro tiene la responsabilidad de concretar el convenio, develando la intención de las partes.

En este proceso interpretativo, el árbitro debe considerar ciertas reglas, derivadas de la interpretación de los contratos: (1) adscribirle al lenguaje su significado común, salvo que el convenio provea expresamente una definición especial; (2) otorgarle su significado usual a los términos técnicos; (3) leer el convenio como un todo e interpretar cada parte con referencia a las demás cláusulas; (4) no descartar los usos y prácticas pasadas, porque éstos pueden ofrecerle unas guías significativas para interpretar las cláusulas del convenio; (5) asegurarse que su interpretación del convenio sea razonable y efectiva; (6) interpretar el sentido literal de aquellas cláusulas que reflejen claramente la intención de las partes.[94] Al interpretar el convenio colectivo, el árbitro no está limitado exclusivamente al

---

D. Bloch y H. Zahn, Labor Agreement in Negotiation and Arbitration, Washington, D.C. 1983, pág. 102.

[93] D. Fernández Quiñones, El Arbitraje Obrero-Patronal, op.cit., pág. 199.

[94] J.R.T. v. Vigilantes, supra, pág. 586; J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, 331; A.M.A. v. J.R.T., 114 DPR 844, 847 (1983). Véase, además, D. Fernández Quiñones, op.cit., págs. 199-207.

contenido de éste, sino que puede hacer uso de otras fuentes siempre que se respete la esencia del contrato.[95]

La Opinión mayoritaria afirma que es deber del árbitro "interpretar las cláusulas del convenio colectivo".[96] Sin embargo, hace caso omiso a esa interpretación integral del convenio que le corresponde hacer, en primera instancia, al árbitro, y que según los tratadistas y nuestra jurisprudencia merece una gran deferencia por parte de este Tribunal. La Opinión mayoritaria otorga deferencia a algunas determinaciones de la árbitra y a otras no. Así, reconoce que existe una "deferencia que otorgamos a la árbitra en su interpretación del término justa causa" *a la luz* de la Ley 80, pero no le concede deferencia alguna a la interpretación que da la árbitra al *silencio* del convenio sobre la facultad de conceder remedios. La árbitra, como intérprete primaria del convenio, concluyó que el silencio del convenio en cuanto al remedio ampliaba sus facultades. Por el contrario, la mayoría interpreta que el silencio las limita y convierte el remedio mínimo posible, establecido por ley para el contrato de trabajo individual, en el máximo otorgable bajo un convenio colectivo. Ello contradice la flexibilidad en la confección de remedios que

___

[95] *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, *supra*, págs. 330-331; *J.R.T. v. National Packing Co.*, 112 D.P.R. 162, 166 (1982); *United Steelworkers v. Enterprise Corp.*, *supra*, pág. 597.

[96] *Confederación de Organizaciones de Puerto Rico v. Servidores Públicos Unidos de Puerto Rico*, Opinión mayoritaria, p. 29.

la propia Opinión mayoritaria le reconoce a los árbitros para responder "a una variedad de situaciones que no fueron atendidas expresamente por las partes en el convenio laboral". So color de asegurar que esa flexibilidad no sea "irrestricta",[97] la Opinión mayoritaria elimina *toda* flexibilidad y restringe al máximo esa capacidad del árbitro de crear remedios.

Este proceder choca directamente con nuestras reiteradas determinaciones de que nuestra interpretación en estos casos debe ser a favor del obrero, política que la mayoría menciona pero no pone en vigor.[98] En vez de la interpretación *liberal* reiterada como correcta a través de los años, la Opinión mayoritaria adopta la interpretación más restrictiva posible.

### D. El Laudo Arbitral

La determinación que toma el árbitro respecto a la controversia laboral se conoce como laudo de arbitraje. Éste "no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos".[99] A través de esta decisión es que el árbitro resuelve el litigio de forma final e

---

[97] *Íd.*, p. 35.

[98] *Íd.*, p. 16.

[99] U.G.T. v. Challenger Caribbean Corp., 126 D.P.R. 22, 29 (1990); J.R.T. v. Sociedad Mario Mercado e Hijos, 74 D.P.R. 403, 412 (1953); J.R.T. v. New York & P.R. Steamship, Co., *supra*, 800.

inapelable.[100] Su estructura está definida por dos elementos principales: la parte sustantiva de derecho, es decir, la razón de la decisión y la parte dispositiva, que es donde se establece el remedio a la disputa. Una vez emitido el laudo, termina la función adjudicativa del árbitro.

Los tribunales han adoptado un principio de autorestricción respecto a la revisión de los laudos. En su origen, esta norma respondió al propósito de permitir el desarrollo de un sistema de arbitraje laboral.[101] La deferencia a las determinaciones del árbitro, a tenor con la norma de autorrestricción, es tan amplia que un laudo no puede ser anulado por meros errores de hecho o derecho.[102] Sin embargo, esta norma general no se aplica con el mismo rigor si la parte que desea que se impugne el laudo argumenta cualquiera de las siguientes causas: (1) fraude, (2) conducta impropia, (3) falta de debido procedimiento en la celebración de la vista, (4) violación de la política

---

[100]   D. Fernández Quiñones, El Arbitraje Obrero-Patronal, *op.cit.*, pág. 10.

[101]   U.G.T. v. Corp. Difusión Púb., *supra*, pág. 682; J.R.T. v. Corp. Crédito Agrícola, *supra*, 849. Véase, además, D. M. Helfeld, *op.cit.*, pág. 8.

[102]   Febus y Otros v. Marpe Const. Corp., 135 D.P.R. 206, 218 (1994); J.R.T. v. Cooperativa de Cafeteros, 89 DPR 498, 503 (1963); Rivera Adorno v. Autoridad de Tierras, 83 DPR 258, 266 (1961); J.R.T. v. Orange Crush of P.R., 80 D.P.R. 292, 295 (1958); J.R.T. v. New York and Porto Rico Steamship, *supra*, pág. 800; Ríos v. Puerto Rico Cement Corp., 66 D.P.R. 470, 477-78 (1946).

pública, (5) falta de jurisdicción y (6) que el laudo no resuelve todas las controversias que se sometieron.[103]

Si ninguna de las circunstancias mencionadas está presente, los tribunales sólo pueden revisar un laudo si al redactar la cláusula de arbitraje, o como parte del pacto de sumisión, las partes le impusieron al árbitro la obligación de resolver la controversia conforme a derecho.[104] Precisamente, esta estipulación fue incluida en el convenio colectivo entre la SPU y la COPR.[105] Que el laudo deba emitirse conforme a derecho significa que los foros judiciales apelativos tendrán la autoridad para revisar todas las cuestiones de derecho *sustantivo* resueltas por el árbitro, para poder determinar si son

---

[103] C.F.S.E. v. Unión de Médicos, *supra*, pág. 449; Condado Plaza v. Asoc. Emp. Casino P.R., *supra*, pág. 353; J.R.T. v. Junta Adm. Muelles Mun. de Ponce, *supra*, pág. 325; J.R.T. v. Hato Rey Psychiatric Hosp., *supra*, pág. 68; U. I. L. de Ponce v. Dest. Serrallés, Inc., *supra*, págs. 352-353 (nota 2); J.R.T. v. New York and Porto Rico Steamship, *supra*, pág. 800.

[104] C.F.S.E. v. Unión de Médicos, *supra*, pág. 449; U.G.T. v. Corp. Difusión Púb., *supra*, pág. 682; Condado Plaza v. Asoc. Emp. Casino P.R., *supra*, pág. 349; J.R.T. v. Corp. Crédito Agrícola, *supra*, pág. 849; J.R.T. v. Hato Rey Psychiatric Hosp., *supra*, pág. 67; U.I.L. de Ponce v. Dest. Serrallés, Inc., *supra*, págs. 352-353; J.R.T. v. National Packing Co., *supra*, pág. 165; J.R.T. v. Securitas, Inc., 111 D.P.R. 580, 582 (1981).

[105] Artículo X: Quejas y Agravios y Arbitraje, Tercer Paso (5), Convenio Colectivo entre Confederación de Organizadores de Puerto Rico y Servidores Públicos Unidos de Puerto Rico/Concilio 95/AFSCME, AFLCIO, pág. 13, 15 septiembre de 2000.

correctas.[106] Sin embargo, hemos establecido claramente que los laudos tienen presunción de corrección, similar al que se atribuye a las determinaciones de las agencias administrativas o a las sentencias, por lo cual la autoridad para revisarlos no constituye una licencia para favorecer la nulidad del laudo. En estas circunstancias, el laudo sólo puede anularse si no se ha resuelto la controversia conforme a derecho.[107]

Incluso, en casos en donde el árbitro viene obligado a resolver conforme a derecho, hemos reiterado la deferencia que merecen sus determinaciones y "nuestra norma de autorestricción judicial, por lo que un laudo basado en una sumisión voluntaria está sujeto a la revisión judicial sólo si las partes convienen que la controversia sometida al árbitro sea resuelta conforme a derecho".[108] Aún cuando sea procedente la revisión judicial del laudo, hemos hecho hincapié en que "*no debemos inclinarnos fácilmente a decretar la nulidad de la decisión a menos que el árbitro*

---

[106] Condado Plaza v. Asoc. Emp. Casino P.R., *supra*, pág. 353; J.R.T. v. Junta Adm. Muelles de Ponce, *supra*, pág. 326; S.I.U. v. Otis Elevator Co., *supra*, pág. 836; U.I.L. de Ponce v. Dest. Serrallés, Inc., *supra*, pág. 353; J.R.T. v. Securitas, Inc., *supra*, pág. 582.

[107] U.G.T. v. Corp. Difusión Púb., *supra*, pág. 683; U.C.P.R. v. Triangle Engineering Corp., 136 D.P.R. 133, 142-143 (nota 7) (1994); Febus v. Marpe, 135 D.P.R. 206 (1994); Rivera v. Samaritano & Co., Inc., 108 D.P.R. 604, 608 (1979).

[108] U.G.T. v. Corp. Difusión Púb., *supra*, pp. 682-683. (Citas internas omitidas) (Énfasis suplido).

*haga caso omiso al derecho aplicable*".[109] En este caso no podemos concluir que la árbitra haya ignorado el derecho aplicable al confeccionar el remedio otorgado.

A través de los años, este Tribunal se ha encargado de aclarar las implicaciones jurídicas de la obligación de resolver conforme a derecho. Inicialmente, establecimos que:

> Condicionar un laudo a que sea "conforme a derecho" significa que el árbitro *no puede ignorar* las normas interpretativas de derecho *sustantivo* emitidas por los Tribunales Supremos de Estados Unidos y Puerto Rico en el campo de derecho laboral, y que se reputarán persuasivas las decisiones de los tribunales de primera instancia y de agencias administrativas, y los laudos y escritos de reputados árbitros.[110]

Posteriormente, aclaramos que al interpretar un convenio el árbitro debe considerar, además de su contenido, otras normas interpretativas del derecho sustantivo laboral federal y local.[111] En otras palabras, la esencia del convenio colectivo se extraerá no tan sólo de su contenido y del acuerdo de sumisión, sino de fuentes de derecho externas al contrato, pero relacionadas con la finalidad del mismo. A través de este proceso analítico, el árbitro definirá un remedio que sea conforme tanto a la esencia del convenio como al pacto de sumisión.

---

[109] U.G.T. v. Corp. Difusión Púb., *Id.*

[110] A.E.P. v. U.I.E.A.E.P., 130 D.P.R. 983, 988 (1992) (Énfasis suplido); J.R.T. v. Hato Rey Psychiatric Hosp., *supra*, pág. 68.

[111] Condado Plaza v. Asoc. Emp. Casino P.R., *supra*, pág. 351.

Uno de los elementos externos al convenio que deben considerarse cuando éste se interpreta es, sin duda, la normativa de las relaciones laborales, lo cual incluye la filosofía constitucional de la negociación colectiva y los procedimientos generados por ésta. Entonces, como el arbitraje laboral es el elemento práctico de la negociación colectiva, la filosofía que emerge de este derecho constitucional, junto con la legislación laboral que se encarga de implementarla, deben ser ponderados por el árbitro al emitir su laudo.

También, si las partes optan por someterse al arbitraje del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos, el reglamento de esta unidad administrativa será aplicable y el árbitro deberá utilizarlo al interpretar el convenio para adjudicar la controversia y definir el remedio. Sobre el particular, el reglamento establece lo siguiente, en su Artículo IV, inciso (d): *[l]a justicia, razonabilidad,* prontitud y economía en el proceso *prevalecerán en la resolución de las controversias*".[112]

Otro factor externo que el árbitro debe considerar, al tratar de precisar la esencia del convenio colectivo y el acuerdo de sumisión, es la jurisprudencia del Tribunal Supremo de los Estados Unidos y del Tribunal Supremo de

---

[112] Énfasis nuestro. Departamento del Trabajo y Recursos Humanos, Artículo IV: Aplicación e Interpretación, *supra*, pág. 3.

Puerto Rico. Esto, porque la normativa que ha sustentado el sistema de arbitraje obrero patronal ha sido elaborada, casi en su totalidad, no a nivel legislativo, sino por la vía judicial.[113]

E. La Concesión de Remedios cuando se resuelve "Conforme a Derecho"[114]

Explicado lo anterior, debemos examinar la extensión de la facultad del árbitro para diseñar remedios y, en particular, si la frase "conforme a derecho" tiene el efecto de limitar dicha facultad al grado que lo hace la Opinión mayoritaria, aunque se trate de una relación laboral regida por un convenio. Más concretamente, si el término "conforme a derecho" implica que, ante el silencio del convenio sobre el remedio específico, el *único* remedio

---

[113] D. M. Helfeld, *op.cit.*, pág. 7.

[114] La noción de que los árbitros deben actuar de acuerdo a la ley es tan antigua como para ser mencionada en normativa legal desde finales del siglo XIX. P. G. Phillip, "Rules o Law or Laissez-Faire in Commercial Arbitration", Harv. Law Review, Vol. 47, 1934-1935, pág. 500-627; nota 83,84, pág. 603-604, citando a Mickles v. Thayer, 14 Allen 114, 119 (Mass, 1867); White Star Mining Co. v. Hultberg, 220 Ill. 578, 77 N.E. 327 (1906).

> …the sumission required the arbitrators to "determine all questions according to rules of law and equity, the same as though the matter was to be tried in a court of law or equity", but the court held that these words were directory only and left the arbitrators "to be the ultimate judges as to how the matter would be tried in a court of law or equity, and thus makes their decision final and conclusive. *Íd*, pág. 604, citando a Greenough v. Rolfe, 4 N.H. 357 (1828); Prescott v. Fellows, 41 N.H. 9 (1860); Matter of Couperie Belge Americaine, S.A., N.Y.L.J., enero 19 de 1934, pág. 307.

que puede conceder el árbitro en una controversia de despido injustificado es el que provee la Ley Núm. 80 de 1976, es decir, el remedio exclusivo de la mesada, o si, por el contrario, el árbitro tiene la latitud necesaria para reinstalar al empleado e incluso ordenar que se le paguen los salarios dejados de percibir.

La autoridad de un árbitro para emitir remedios, igual que su potestad para entender en una controversia, emana del convenio colectivo y el pacto de sumisión. A través de los años, la tendencia ha sido la de conferirle mayor poder a los árbitros en el diseño de un remedio adecuado a su laudo, siempre que el remedio se circunscriba esencialmente a lo que mandan el convenio colectivo y el acuerdo de sumisión sometido por las partes.[115] El Tribunal Supremo de Estados Unidos ha reconocido, en este sentido, la necesaria flexibilidad que deben tener los árbitros en la confección de remedios, la cual debe surgir de la "esencia" (*essence*) del convenio.[116]

---

[115] S.I.U. de P. R. v. Otis Elevator Co., *supra*, págs. 840-842; United Steelworkers v. Enterprise Corp., *supra*, pág. 597.

[116] Énfasis nuestro, United Steelworkers v. Enterprise Wheel & Car Corp., *supra*, 597, según citado por F. Elkouri y E. Elkouri, *op.cit.*, pág. 1189. Véase, además, Challenger Caribbean v. U.G.T., 903 F. 2d 857 (1st Cir. 1990):

> An "arbitrator's award settling a dispute with respect to the interpretation and the application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." Paperworkers v. Misco, 484 U.S. 29, 38 (1987). When an award "manifest[s] an infidelity to this obligation, courts have no choice

En iguales términos se expresó este Tribunal cuando determinamos que no era razonable que un árbitro tuviera "poder para entender en una controversia entre patrono y unión sin tener autoridad para imponer el remedio que creyera propicio de acuerdo al laudo emitido".[117] De esta forma, avalamos el remedio de daños y perjuicios que un árbitro le concedió a una organización obrera por entender que el patrono había intervenido en la acción de descertificación de dicha unión. A este dictamen se llegó a pesar de que dicho remedio no estaba estipulado ni en el convenio colectivo ni en el acuerdo de sumisión y una cláusula de arbitraje establecía que el laudo debía emitirse conforme a derecho.[118] El análisis perseguía establecer que el único requisito que debe cumplir un árbitro en la confección de un remedio es que éste sea

---

but to refuse enforcement of the award." UnitedSteelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960), 80 S.Ct. at 1361. p. 861. We do not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of the award. We cannot vacate the award because the arbitrator misreads the contract, where there is room to do so, nor are we authorized to reject his honest judgment as to the appropriate remedy, if the contract gives him authority to decide that question. "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convincend he committed serious error does not suffice to overturn his decision". *Ibid*, pág. 861.

[117] Sonic Knitting Industries v. I.L.G.W.U., 106 D.P.R. 557, 563-564 (1977).

[118] Sonic Knitting Industries v. I.L.G.W.U., *supra*, pág. 563.

consustancial y afín a los propósitos de la ley y del convenio colectivo.[119] En definitiva, que el remedio no viole el convenio colectivo ni el pacto de sumisión.

Es importante señalar que el *silencio* de las partes sobre una controversia en particular puede ser interpretado por el árbitro al confeccionar su remedio. Los tratadistas Elkouri nos dicen al respecto:

> If a given type of remedy has been used widely by arbitrators, an exceedingly strong case may be made in support of an arbitrator's right to use the remedy absent an express denial in the agreement or submission. *The theory is that the parties may be presumed to have knowledge of arbitral practices, and their silence in their agreement on the subject implies their consent.*[120]

Evidentemente, un lenguaje claramente restrictivo en el convenio colectivo o en el acuerdo de sumisión constituye un factor limitante a la facultad del árbitro para elaborar remedios.[121] Sin embargo, en ausencia de prohibiciones expresas, el árbitro tiene la obligación de

---

[119] S.I.U. de P. R. v. Otis Elevator Co., *supra*, pág. 841.

[120] Énfasis nuestro. F. Elkouri y E. Elkouri, *op.cit.*, pág. 1190.

[121] Sonic Knitting Industries v. I.L.G.W.U., *supra*, pág. 562, citando a Lodge # 12, District #37, International Ass'n of Machinists v. Cameron Iron Works, Inc., 292 F. 2d 112, 119 (5th Cir.), cert. den. 368 US 926 (1961); College Hall Fashions Inc. v. Phill Joint Board, Amalgamated Clothing Workers of America, 408 F. Supp. 722, 728 (E.D. Pa. 1976); Texas Gas Transmission Corp. v. Int'l Chemical Workers, 200 F. Supp. 521, en reconsideración, 527 (S.D. N.Y. 1959), Stutz, Arbitrators and the Remedy Power, Labor Arbitration and Insdustrial Change, National Academy of Arbitrators, Proceedings 16th Annual Meeting, 1963, pág. 54. Véase, además, J.R.T. v. National Packing Co., *supra*, pág. 165, 166; United Steelworkers v. Enterprises Corp., supra, pág. 597; J.R.T. v. Soc. Mario Mercado, *supra*, pág. 407.

cumplir el mandato del convenio y el pacto de sumisión, los cuales le imponen la obligación de buscar un remedio adecuado coherente con su esencia y la razón de ser de la negociación colectiva y el ámbito colectivo en general. Por eso, en el contexto de un despido injusto al amparo de un convenio colectivo, los árbitros pueden conceder remedios mayores que la indemnización económica de la Ley Núm. 80 de 1976, si sus facultades remediales no están expresamente limitadas.

No se trata de un planteamiento nuevo en nuestro derecho laboral. En Junta Rel. del Trabajo v. Soc. Mario Mercado e Hijos,[122] resolvimos que "[e]n *ausencia de una disposición expresa en contrario* en el convenio colectivo, el [árbitro] *tenía facultad* (1) para resolver que aun considerando ciertos los hechos en los cuales el patrono basaba el despido, ésta era una pena demasiado drástica, y (2) para modificar dicha pena". Es decir, lo que requería una disposición expresa en el convenio era la limitación a la facultad del árbitro. En ausencia de dicha limitación expresa, el árbitro podía modificar un castigo impuesto por el patrono en el contexto de un despido. El silencio no era suficiente para truncar las facultades del árbitro, pues la interpretación liberal que exige el ordenamiento laboral, nos obliga a interpretar el silencio a favor de reconocer mayores poderes remediales al árbitro para que éste pueda

---

[122] 74 D.P.R. 403, 407 (1953) (Énfasis suplido).

corregir un capricho patronal. Esto, pues "es innegable la autoridad de un árbitro de *variar* la sanción disciplinaria si considera que la misma es muy severa y drástica",[123] como sería, por ejemplo, sustituir un despido por una sanción menor.

Este Tribunal ha recalcado consistentemente que en el contexto colectivo el árbitro tiene la facultad de reponer al empleado en su puesto y ordenar que se le pague el salario atrasado. Específicamente, hemos distinguido entre la política pública de la Ley Núm. 80 de 1976 y las acciones por despido en el contexto de un convenio colectivo:

> *No discernimos disparidad entre la política del estatuto y el laudo emitido. No se nos ha demostrado que la intención legislativa haya sido fijar sanciones máximas exclusivas para casos de despido cuando media un convenio colectivo y un amplio acuerdo de sumisión sobre la justificación de la cesantía.* ¿Cómo es que puede interpretarse que la legislación sobre la mesada ha obedecido por décadas al propósito de impedir que un árbitro, bajo un acuerdo de sumisión *que no limite claramente sus poderes*, ordene la reposición de un empleado y el pago de sus sueldos dejados de percibir, más intereses? *En Puerto Rico, hemos distinguido tajantemente entre los derechos bajo un convenio colectivo y los derechos de mesada.*[124]

También, hace más de medio siglo resolvimos que "[n]aturalmente, en dichos convenios colectivos de trabajo, *la ausencia de causa justa da derecho a la reposición y al*

---

[123] <u>Colón Molinary v. A.A.A.</u>, 103 D.P.R. 143, 150 (1974) (Énfasis suplido).

[124] Énfasis nuestro. <u>J.R.T. v. Securitas, Inc.</u>, *supra*, pág. 583.

*pago de los salarios dejados de devengar, y no se trata pues de una simple cuestión de mesada…".*[125]

La decisión que hoy adopta el Tribunal vira al revés esta normativa. Ahora, se presume la limitación de las facultades del árbitro y lo que tiene que ser expreso no es la limitación de estas facultades sino la concesión de éstas en el convenio. De esa forma, la mayoría convierte el silencio, no en un mandato para interpretar el convenio, sino en una prohibición de hacerlo. Y al resolver de esta forma, mediante alguna alquimia a la inversa, supuestamente fortalece "la política pública imperante en nuestra jurisdicción en torno a la importancia y el poder vinculante de la negociación colectiva laboral".[126]

La política pública laboral puertorriqueña rechaza los despidos injustificados, a favor de la protección del empleo existente. Por tanto, tiene como objetivo el que los despidos sean por justa causa. Esa es la política pública, tanto en el ámbito individual, con la Ley Núm. 80 de 1976, como en el colectivo. Lo que marca la diferencia en cada ámbito es el remedio que se provee ante un despido injustificado. Sabemos que en el ámbito individual de la relación laboral contractual la Ley Núm. 80 de 1976 provee el remedio máximo que los empleados pueden obtener ante un

---

[125] J.R.T. v. Securitas, Inc., *supra*, pág. 583, citando a Wolf v. Neckwear Corp., 80 D.P.R. 537, 543 (1958).

[126] Confederación de Organizaciones de Puerto Rico v. Servidores Públicos Unidos, Opinión mayoritaria, p. 54. (Énfasis suplido).

despido injustificado.[127] Sin embargo, este remedio representa el mínimo que puede ser concedido a los empleados que componen el ámbito colectivo.[128] Esto, porque un convenio colectivo puede mejorar, pero nunca disminuir, el estándar mínimo de empleo establecido por la ley laboral estatal.[129] Al respecto, las Guías para la Interpretación y Aplicación de la Ley Núm. 80 de 1976 indican:

> La protección que brinda la Ley Núm. 80, *supra*, a los trabajadores no puede eliminarse mediante convenio colectivo. Esto significa que mediante el proceso de negociación colectiva *puede disponerse como mínimo*, ante un despido injustificado, el remedio que dispone dicha Ley. *Las partes tienen la potestad de pactar cualquier remedio que supere el que dispone la Ley Núm. 80, supra, más no uno menor.*[130]

Precisamente, lo que brinda a un laudo la cualidad de ser conforme a derecho es su coherencia con la política pública laboral. No hay base jurídica para concluir que la finalidad de la Ley Núm. 80 de 1976 es afectar la libertad del árbitro para conceder un remedio más justo y más

---

[127] El Tribunal de Apelaciones de los Estados Unidos para el primer circuito concluyó que la Asamblea Legislativa concibió la Ley Núm. 80 de 1976, que es aplicable a los empleados individuales no organizados, " as a remedial measure that would provide employees with a *baseline level* of economic protection from the consecuences of arbitrary discharge". Énfasis nuestro. Otero Burgos v. Interamerican Univ., *supra*, pág. 23.

[128] Véase, Otero Burgos v. Interamerican Univ., *supra*, pág. 9.

[129] J.R.T. v. Vigilantes, Inc., *supra*, pág. 590; Véase, además, Challenger Caribbean v. U.G.T., *supra*, pág. 869.

[130] Énfasis nuestro. Departamento del Trabajo y Recursos Humanos, Guía para la Interpretación y Aplicación de la Ley Núm. 80, Aprobada el 30 de mayo de 1976, pág. 58.

coherente con el ámbito colectivo, como tampoco para pensar

que cuando el árbitro otorga el remedio de restitución y

paga atrasada no está actuando conforme a derecho.[131] Más

bien, la posibilidad de dicho remedio es inherente a la

facultad del árbitro de remediar un despido prohibido por

el convenio.[132] Resolver lo contrario, por un lado,

desnaturalizaría la Ley Núm. 80 de 1976 y, por el otro,

impediría que se cumpla de forma efectiva con la política

pública laboral. Es por eso que un árbitro que concede un

remedio más beneficioso para el obrero no actúa contrario a

---

[131] Los tribunales de Estados Unidos han resuelto que la Ley Núm. 80 de 1976 no fue creada para interferir con la versión de la National Labor Relations Act, que en Puerto Rico es la Ley Núm. 130 de 1945 y que en el argot de estudiosos de relaciones laborales se conoce como una pequeña Ley Wagner al igual que otras leyes similares en muchos estados de los E.U. Otero Burgos v. Interamerican Univ., *supra*, pág. 24, citando a Hosp. Cristo Redentor, Inc. v. N.L.R.B., 488 F. 3d 513, 524 (2007), (1st Circuito).

[132] A. Torres Rivera, *op.cit.*, pág. 187. Coincidimos con Torres Rivera, citando al Lcdo. Román Velazco, Ex – Secretario del Departamento del Trabajo y Recursos Humanos, en cuanto a que:

> … La prohibición de despido injustificado, per se, no convierte al árbitro en un juez que adjudica una querella al amparo de la Ley 80. El hecho de que se le exija que resuelva conforme a derecho sólo atañe al análisis que debe hacerse sobre la naturaleza justificada o injustificada del despido y no al remedio de restitución, que emana directamente de una conclusión de arbitrariedad e injustificabilidad del despido. Existe una clara diferencia cualitativa entre ambos conceptos. *Decidir lo contrario a las normas que rigen el concepto de justa causa atenta contra éstas directamente, mientras que el asunto remedial que nos atañe, lejos de atentar contra el concepto justa causa, lo implementa y viabiliza.* Énfasis nuestro. A. Torres Rivera, *op.cit.*, pág. 187.

derecho, siempre que al hacerlo cumpla con la política pública laboral y el convenio entre las partes.[133]

Es cierto que si el convenio colectivo no define lo que constituye justa causa y la cláusula de arbitraje requiere que el laudo sea emitido conforme a derecho, el árbitro viene obligado a examinar la definición de este término jurídico contenida en la Ley Núm. 80 de 1976 y la jurisprudencia que la interpreta. Esta definición recoge la política pública en torno al asunto y el árbitro debe utilizarla de forma que nutra no tan sólo la letra del convenio sino su esencia.[134]

Ello no quiere decir, sin embargo, que el árbitro esté limitado al *remedio* que provee este estatuto.[135] El remedio pautado en la Ley Núm. 80 de 1976 no define política pública, más bien es el reconocimiento de que la política

---

[133] J.R.T. v. Vigilantes, Inc., *supra*, págs. 594-595. Véase, además, Nazario v. Tribunal Superior, *supra*, págs. 849-853.

[134] D. Fernández Quiñones, El Arbitraje Obrero-Patronal, *op.cit.*, pág. 217. Sobre este particular, el Tribunal Supremo de Estados Unidos ha especificado siete criterios para que los árbitros puedan determinar si en una acción de despido existe justa causa. Estos factores son: (1) la razonabilidad de la versión del patrono; (2) la notificación dada al empleado; (3) cuán apropiado fue el momento en que se llevó a cabo la investigación; (4) si la investigación fue justa ("fair"); (5) la evidencia acumulada contra el empleado; y (7) la relación entre el grado de la medida disciplinaria y la naturaleza de la falta, con el expediente de trabajo del empleado. United Paperworkers International Union AFL, CIO v. Misco, Inc., 484 U.S. 29, 34 (1987), nota 5.

[135] D. Fernández Quiñones, "Análisis del Término 2006-2007 Tribunal Supremo de Puerto Rico: Derecho Laboral", *op.cit.*, pág. 3.

pública laboral de protección de empleo es de menor intensidad en el ámbito individual de la relación laboral. Por el contrario, la inclusión en el convenio colectivo del requisito de justa causa para el despido conlleva el remedio de reinstalación y de la paga atrasada dejada de percibir, precisamente porque la política pública laboral de protección de empleo es de mayor intensidad en el ámbito colectivo de la relación laboral. Desafortunadamente, la Opinión mayoritaria confunde estos conceptos y no distingue entre derecho sustantivo y remedios en cuanto al requisito de "conforme a derecho".

Los trabajadores se organizan sindicalmente para negociar colectivamente un convenio colectivo que les proteja. Por eso, ante el enorme poder de despedir que tienen los patronos, la inmensa mayoría de los convenios colectivos contienen la limitación expresa de que los despidos no pueden ser injustificados. Si un convenio colectivo incluye una cláusula que requiera justa causa para el despido, los árbitros deben velar por el estricto cumplimiento de la misma.[136] Concretamente, el tratadista Fairweather expone:

> …labor agreements negotiated with unions usually have provided that employees may be discharged only for just cause. *It is this provision that generates reinstatement as the remedy for a*

---

[136] F. Elkouri y E. Elkouri, *op.cit.*, págs. 930-931.

> *discharge* when an arbitrator finds that the discharge was not for just cause.[137]

Cabe señalar que aun cuando un convenio no incluya expresamente una disposición de justa causa para el despido, la práctica arbitral es resolver que la misma está incluida implícitamente en todos los convenios colectivos. Sobre el particular, la Prof. Martha West, citando a F. Elkouri y E. Elkouri, expone:

> Most collective agreements require "cause" or "just cause" for discharge or discipline. *Even in the absence of an express "just cause" limitation, arbitrators will imply such a limitation on discharge*.[138]

Según explica el tratadista Brand, para muchos árbitros la limitación de justa causa para el despido es parte esencial e implícita de todo contrato colectivo y es central a su decisión cuando juzgan las acciones de los patronos.[139] La lógica subyacente a esta presunción es que si el patrono pudiera despedir a sus trabajadores en cualquier momento y por cualquier causa, entonces no tendrían mucho valor las disposiciones contractuales que regulan la antigüedad y otras protecciones contenidas en los convenios colectivos.

---

[137] R. J. Schoonhoven (editor), <u>Fairweather's Practice and Procedure in Labor Arbitration</u>, 4ta Edición, The Bureau of National Affairs, Inc., Washington, D.C., 1999, pág. 455.

[138] Énfasis nuestro. M. West "The case against reinstatement in wrongful discharge." University of Illinois Law Review. Num. 1, Volume 1988, pág. 22, nota 111, citando a F. Elkouri & E. Elkouri, <u>How Arbitration Works</u>, 4th Edition, 1985, pág. 652.

[139] N. Brand, <u>Discipline and Discharge in Arbitration</u>, Bureau of National Affaire, Washington D.C.,1998. pág. 29

Tratándose, pues, de una presunción, si las partes quieren alterarla deben expresarlo claramente en su convenio.

Ciertamente, la inexistencia de justa causa en un despido viola la política pública laboral en contra de los despidos caprichosos y en defensa del trabajo.  Un laudo que tolera el despido sin justa causa viola esta política pública y el árbitro que lo emite, al no actuar de acuerdo a ésta, no está actuando conforme a derecho. Tampoco actúa conforme a derecho si ordena el pago de la mesada, en vez del remedio de reposición en el empleo, aun cuando el convenio particular no lo requiera expresamente.  Si la política pública laboral del país es proteger el empleo existente o la tenencia de éste, un laudo que ante un despido injustificado manda la reposición del empleado lejos de contradecir esta política pública, la fortalece. Esa determinación del árbitro es, pues, conforme a la ley y no está en conflicto explícito, ni implícito, con otras leyes y precedentes legales en el ámbito colectivo de nuestro sistema de relaciones del trabajo.

Muchos especialistas del Derecho Laboral entienden que hoy día la reinstalación del empleado es el remedio universal del arbitraje en caso de despido injustificado.[140]

---

[140] "Si el árbitro determina que el patrono carecía de justa causa para el despido, procederá a diseñar el remedio adecuado. *La reinstalación del empleado ha sido el remedio común y más usado por los árbitros en casos de arbitraje laboral por despido ilegal*". Énfasis nuestro. D. Fernández Quiñones, El Arbitraje Obrero-Patronal, *op.cit.*, pág. 221, citando Dallas L. Jones, Ramifications of Back-Pay Awards Discharge Cases, 22 National Academy of Arbitrators 163,

Se trata de la consecuencia lógica y esperada del hallazgo del árbitro que, por un lado, identifica la ausencia de justa causa para el despido y, por el otro, al darse la acción patronal en un contexto colectivo, reconoce que dicha acción, al ser contraria al convenio, no causó una ruptura de la relación contractual, por lo cual los derechos de empleo siguen intactos. En palabras del tratadista Fairweather:

> … Under this system, it is technically more accurate to say that an employee who was discharged not for just cause *was not in fact discharged*, and hence the employment relationship set out in the seniority provisions in the labor agreement was not broken.[141]
>
> …
>
> *Hence, "reinstatement" by an arbitrator is simply a finding that under the labor agreement just cause was not present and contractual employment rights remain in effect; that is, no effective severance by discharge occurred.*[142]

---

163-164 (1970). Véase, además, Departamento del Trabajo y Recursos Humanos, Guía para la Interpretación y Aplicación de la Ley Núm. 80, Aprobada el 30 de mayo de 1976, *op.cit.*, pág. 22, donde se establece que [e]l remedio de la reposición o restitución en el empleo solamente está disponible… o cuando el mismo surge de un convenio colectivo."

[141] R. J. Schoonhoven (editor), *op.cit.*, pág. 455.

[142] Énfasis nuestro. R. J. Schoonhoven (editor), *op.cit.*, pág. 583.

Se trata en definitiva de proveer lo que se conoce como "make whole remedies".[143] Brand explica este término de la siguiente forma:

> Arbitrators uniformly hold that the employee who is discharged without just cause is entitled to a "make whole" remedy. *The make whole remedy attempts to place the employee in the same position she would have been in if the improper discipline had not occurred.*[144]

También indica este autor lo siguiente: "*[r]einstatement is the central and most common element of the modern remedy for discharge without just cause*".[145] Además, señala que la paga atrasada es otro componente esencial de un remedio comprensivo:

> *Back pay is the other essential component of a make whole remedy.* The purpose of the back pay is to make the employee whole for the loss sustained by his discharge and to put him in exactly the same position financially that he would have been in had the discharge not occurred. In addition to making the grievant whole, back pay may serve a public policy of objective deterrence.[146]

---

[143] N. Brand, *op.cit.*, pág. 370, citando a 95 LA (Labor Arbitration Report) 500, 508 (Jones, 1990).

[144] Énfasis nuestro. N. Brand, *op.cit.*, pág. 369, citando a W.C. Nabors Co. v. N.L.R.B., 323 F. 2d 686, 54 Labor Reference Resource Management (LRRM) 2259, 2262 (5th Cir., 1963).

[145] Énfasis nuestro. N. Brand, *op. cit.*, págs. 374.

[146] N. Brand, *op. cit.*, pág. 375. Para colocar al empleado en su condición anterior, los árbitros pueden ser creativos y tomar acciones remediales relacionadas con "restore the status quo ante, including expunging the employee's record, restoring seniority, awarding bonuses, wage increases and overtime pay, vacation, holiday and leave credits, and pension and welfare benefits". N. Brand, *op.cit.*, pág. 376.

De esta forma, el laudo coherente, en ausencia de situaciones particulares, siempre unirá la reinstalación del empleado en su puesto con el pago de los haberes dejados de otorgar.[147] La autoridad para hacerlo proviene y está implícita en el poder del árbitro de determinar si existe "suficiente causa" para apoyar la medida disciplinaria impuesta por el patrono. Al igual que la relación entre el ascenso y el aumento de sueldo, difícilmente puede lograr la reinstalación su objetivo restaurador sin la compensación debida al empleado despedido injustamente:

> …cuando el árbitro decide que el despido fue impropio, puede ordenar la reinstalación con paga atrasada, total, parcial o ninguna. El propósito de la paga atrasada es compensar al empleado en la pérdida de salarios que ha incurrido como consecuencia de la violación del convenio colectivo por el patrono; es restaurar el status quo económico.[148]

En definitiva, la doctrina reconoce al árbitro la potestad de conceder el remedio de la reinstalación y la paga atrasada a los empleados organizados sindicalmente, porque al despedir injustificadamente a un empleado unionado el patrono viola el convenio, lo cual constituye una práctica ilícita de acuerdo a la Ley Núm. 130 de

---

[147] R. J. Schoonhoven (editor), *op.cit.*, págs. 458-459.

[148] D. Fernández Quiñones, El Arbitraje Obrero-Patronal, *op.cit.*, pág. 222, citando Golden State Bottling Co. v. N.L.R.B., 414 US 168, 188 (1973); N.L.R.B. v. JH Rutter Mfg. Co., 396 US 258, 263 (1969).

1945.[149] Además, la esencia de la negociación colectiva es proteger el empleo existente y mejorar las condiciones de empleo y sueldo de los obreros.[150] Al reponer al empleado y ordenar pagarle la paga atrasada, el árbitro no está enmendando o modificando las disposiciones del convenio, sino reparando la falta del patrono y regresando la relación contractual a la situación existente antes del despido.

En vista de lo anterior, entiendo que la frase "conforme a derecho" no implica una limitación a la facultad que tiene el árbitro para elaborar remedios, máxime cuando el pacto de sumisión solicita que se provea el remedio adecuado y el convenio no establece expresamente los remedios que se excluyen de su discreción. Esta frase lo único que significa es que el laudo emitido, conjuntamente con la parte dispositiva del remedio, tiene que ser fiel a la esencia del convenio colectivo y al pacto de sumisión. Ello se logra interpretando el contenido del convenio y del acuerdo de sumisión, a la luz de la normativa laboral federal y local pertinente.

En ese sentido, plantear que el pago de la mesada es el único remedio aplicable al ámbito colectivo, porque el

---

[149] Al respecto, el estatuto dispone que "[s]erá práctica ilícita del trabajo el que un patrono, actuando individualmente o concertadamente con otros… [v]iole los términos de un convenio colectivo". 29 L.P.R.A. sec. 69(1)(f).

[150] Esto siempre que no esté expresamente prohibido por el convenio colectivo o el pacto de sumisión.

convenio requiere que el laudo sea conforme a derecho, es del todo incoherente. El remedio de la mesada es extraño al contexto unionado, donde existe un convenio colectivo para evitar la acción unilateral patronal. La mesada es el remedio mínimo concedido por la legislación social del trabajo en el ámbito individual. En el ámbito colectivo existe la posibilidad expresa o implícita de remedios más abarcadores que esa exigua indemnización económica.[151]

II.

Al examinar en conjunto las cláusulas del convenio colectivo de la SPU y la COPR se puede observar claramente

---

[151] En una ocasión previa en que este Tribunal tuvo ante sí una controversia como la que nos ocupa, emitimos una sentencia para confirmar el laudo que repuso en su empleo al trabajador y ordenó el pago del salario adeudado. Esta determinación se dio en el contexto de un convenio colectivo que le requería al árbitro resolver conforme a derecho y disponía que los despidos fueran justificados y ante un pacto de sumisión que le requería al árbitro proveer "el remedio adecuado". <u>H.I.E.Tel. v. Celulares</u>, *supra*. Se emitieron dos opiniones de conformidad. Una, suscrita por la Juez Asociada Rodríguez Rodríguez, a la cual se unió el Juez Presidente Hernández Denton y el fenecido Juez Asociado Fuster Berlingeri, entendió que el requisito de que el laudo sea conforme a derecho puede limitar la facultad del árbitro al remedio provisto por la Ley Núm. 80 de 1976, si el convenio no provee el remedio de reinstalación ni requiere que el despido sea justificado. Al analizar las cláusulas del convenio, esta opinión de conformidad concluyó que las partes le habían otorgado al árbitro la facultad de conceder el remedio más abarcador de reposición con paga porque en dos secciones del convenio, respecto al plan médico y las cuotas a la unión, se hacía referencia a esta potestad. La segunda opinión de conformidad, suscrita por el Juez Asociado Rebollo López, a la cual se unió la Jueza Asociada Fiol Matta, sostuvo que el término "conforme a derecho" no es un limitante a la autoridad que tiene el árbitro para diseñar remedios. En otras palabras, que la frase conforme a derecho no implica que el único remedio a concederse será el contenido en la Ley Núm. 80 de 1976.

que, por un lado, éstas establecen que el laudo deberá ser conforme a derecho y, a la vez, sólo permiten el despido por justa causa.[152]

Al despedir al señor Lugo Reyes injustificadamente, la SPU incurrió en una práctica ilícita pues violentó los términos del convenio colectivo con la COPR. Aplica, pues, la Ley Núm. 130, que contempla la restitución del empleado como remedio ante dicho capricho patronal. Siendo ello así, resolver "conforme a derecho" no se limita a estudiar únicamente la Ley 80, como concluye la mayoría.

La Ley Núm. 80 de 1976 no está incluida en el marco decisional arbitral que tiene lugar al amparo de un convenio colectivo precisamente *porque no aplica al contexto colectivo de empleados organizados*. Resolver lo contrario socava la institución de la negociación colectiva y pervierte la política pública que favorece la concertación de convenios y sus mecanismos para la solución de controversias. También destruye el delicado balance entre el derecho del patrono a escoger sus empleados y la política pública laboral de proteger el trabajo existente y repudiar los despidos injustos. Al aplicar la Ley Núm. 80 de 1976 al contexto laboral colectivo se subvierte la

---

[152] Artículo VIII: Antigüedad, Convenio Colectivo entre Confederación de Organizadores de Puerto Rico y Servidores Públicos Unidos de Puerto Rico/Concilio 95/AFSCME, AFLCIO, pág. 9; Artículo IX: Prerrogativas Gerenciales, Convenio Colectivo entre Confederación de Organizadores de Puerto Rico y Servidores Públicos Unidos de Puerto Rico/Concilio 95/AFSCME, AFLCIO, pág. 11.

naturaleza protectora que ésta ejerce en el ámbito individual, para convertirla en un estatuto que limita los derechos adquiridos a través de la negociación colectiva.

Al amparo de la Ley 130 y la política pública laboral, la árbitra Guzmán Rodríguez tenía la obligación, conforme al derecho vigente, de reparar el daño ocasionado por la SPU al despedir sin justa causa al señor Lugo Reyes. La única forma de reparar ese daño era regresar la situación a las condiciones materiales y económicas prevalecientes antes de la ocurrencia del acto disciplinario, protegiendo el trabajo que disfrutaba el señor Lugo Reyes y reponiéndole en su puesto con la paga de los salarios dejados de devengar.

La decisión de la mayoría de este Tribunal ha dejado a las trabajadoras y los trabajadores en Puerto Rico más vulnerables al capricho patronal. Por eso y porque es incorrecta en derecho, disiento.


Liana Fiol Matta
Jueza Asociada